## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ZACHARY GIVEN, KRISTOPHER   :
LAWSON, VINCENT MCCLEERY,   :
and SEAN MCMURRAN, Individually :
and on Behalf of Other Persons   :
Similarly Situated,   :
  :
    Plaintiffs,   :
  :
   v.   :
  :
LOVE'S TRAVEL STOPS &   :
COUNTRY STORES, INC.,   :
  :
    Defendant.   :

Civil Action No. 1:17-CV-01266-CCC

The Hon. Christopher C. Conner

## DEFENDANT LOVE'S TRAVEL STOPS & COUNTRY STORES, INC.'S AMENDED MEMORANDUM IN SUPPORT OF ITS OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION

# TABLE OF CONTENTS

PAGE

I.   INTRODUCTION .................................................................1

II.  STATEMENT OF FACTS .....................................................2

    A.   Six To 11 Team Members Typically Work On A Shift......................2

    B.   Operations Managers Direct All Team Members On A Shift And Are Critical To Hiring And Firing ...............................3

    C.   Each Plaintiff Is A Former Operations Manager Who Left Love's In Circumstances Impugning His Veracity Or Judgment ..................................................................4

III. PROCEDURAL HISTORY .......................................................6

    A.   On July 18, 2017, Plaintiffs Alleged Love's Misclassified Operations Managers As Exempt From The FLSA's Overtime Requirement And Thus Owes Them Overtime Premiums .................6

    B.   Since September 15, 2017, Discovery Has Been Ongoing..................6

    C.   On October 16, 2017, Plaintiffs Moved For Conditional Certification, Seeking The Social Security Numbers, Addresses, Telephone Numbers, And Emails Of More Than 1,929 Current Or Former Operations Managers ..................................7

IV.  STATEMENT OF THE QUESTION INVOLVED.......................................9

V.   ARGUMENT.....................................................................10

    A.   Whether To Enjoin Love's To Divulge To Three Class-Action Firms Private Contact Information For 1,929 People, And Then Require Notice Of This Lawsuit To Those Persons, Is Committed To This Court's Broad Discretion.................................10

        1.   Plaintiffs Seek an Invasive Injunction, But Do Not Identify the Governing Rule Of Civil Procedure ..................10

        2.   Federal Rule Of Civil Procedure 83(b) Allows The Court To Grant Or Deny The Injunction Plaintiffs Request At The Court's Discretion .......................................12

B.  The Court Should Not Force Love's To Divulge Names,
    Social Security Numbers, Etc. Of 1,929 People, And Then
    Require Notice Of This Lawsuit To Those Persons ........................14

    1.  Plaintiffs Have Not Shown, And Could Never Show,
        That Liability Could Be Determined On The Basis Of
        Common Evidence ...................................................................15

        a.  Liability Turns On Whether OMs Have Primarily
            Non-Managerial Duties .................................................15

        b.  Plaintiffs Point To No Common Evidence That
            OMs Nationwide Have Materially The Same,
            Primarily Non-Managerial Duties ................................16

            (i)   Evidence That OMs Are Subject To
                  Common Policies, Training, And Pay
                  Practices Does Not Suggest They Had The
                  Same, Primarily Non-Managerial Duties............17

            (ii)  Evidence Plaintiffs, Or Other OMs,
                  Performed Non-Exempt Tasks Does Not
                  Suggest They Had The Same, Primarily
                  Non-Managerial Duties .......................................19

        c.  Plaintiffs Could Not Possibly Point To Common
            Evidence That OMs Nationwide Have Materially
            The Same, Primarily Non-Managerial Duties...............21

            (i)   Plaintiffs Admit They Have No Idea
                  Whether "Similarly Situated" OMs Exist ...........22

            (ii)  Love's Declarations Show That Not All
                  OMs Have Materially The Same, Primarily
                  Non-Managerial Duties .......................................23

    2.  Forcing Love's To Provide Personal And Private Contact
        Information For 1,929 People, And Then Send Those
        People Notice Of This Lawsuit, Would Inflict Substantial
        Harm......................................................................................29

ii

**TABLE OF CONTENTS**
(CONTINUED)

**PAGE**

3.   The Named Plaintiffs' Defects In Character And
     Judgment Would Make Them Poor Representatives Of A
     Collective .......................................................................................31

VI.   CONCLUSION..............................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aguirre v. Tastee Kreme #2, Inc.*,
  Civ. A. No. 16-2611, 2017 U.S. Dist. LEXIS 83944 (S.D. Tex.
  Apr. 13, 2017) ...................................................................................................30

*Asirifi v. W. Hudson Sub-Acute Care Ctr., LLC*,
  Civ. A. No. 11-04039, 2014 WL 294886 (D.N.J. Jan. 24, 2014).......................18

*Beery v. Quest Diagnostics, Inc.*,
  Civ. A. No. 12-00231, 2013 WL 3441792 (D.N.J. July 8, 2013) ...................7, 8

*Billingsley v. Citi Trends, Inc.*,
  560 Fed. Appx. 914 (11th Cir. 2014)................................................................12

*Bramble v. Wal-Mart Stores, Inc.*,
  Civ. A. No. 09-4932, 2011 U.S. Dist. LEXIS 39457 (E.D. Pa. Apr.
  11, 2011) ......................................................................................14, 28, 29, 31

*Brown v. Barnes & Noble, Inc.*,
  Civ. A. No. 16-cv-07333, 2017 U.S. Dist. LEXIS 67148 (S.D.N.Y.
  May 2, 2017)......................................................................................................21

*Buenaventura v. Champion Drywall, Inc.*,
  Civ. A. No. 10 -00377, 2012 U.S. Dist. LEXIS 41390 (D. Nev.
  Mar. 27, 2012)...................................................................................................12

*Camesi v. Univ. of Pittsburgh Med. Ctr.*,
  729 F.3d 239 (3d Cir. 2013) .............................................................................11

*Cooney v. City of Chicago*,
  644 F. Supp. 2d 1061 (N.D. Ill. June 12, 2009) ...............................................21

*Davis v. Westgate Planet Hollywood Las Vegas, LLC*,
  Civ. A. No. 2:08-cv-00722, 2009 WL 5038508 (D. Nev. Dec. 15,
  2009) .................................................................................................................12

iv

## <u>TABLE OF AUTHORITIES</u>
### <u>(CONTINUED)</u>

**Page(s)**

**Cases**

*Dreyer v. Altchem Env. Servs., Inc.*,
  Civ. A. No. 06-2393, 2006 U.S. Dist. LEXIS 93846 (D.N.J. Dec.
  12, 2006) ...................................................................................................29

*Frey v. Spokane County Fire Dist. No. 8*,
  Civ. A. 05-289, 2006 U.S. Dist. LEXIS 64538 (E.D. Wash. Sept.
  11, 2006) ...................................................................................................21

*Genesis Healthcare Corp. v. Symczyk*,
  133 S. Ct. 1523 (2013) ...............................................................................7

*Harris v. Healthcare Servs. Grp., Inc.*,
  Civ. A. No. 06–2903, 2007 U.S. Dist. LEXIS 55221 (E.D. Pa. Jul.
  31, 2007) ...................................................................................................30

*Harrison v. McDonald's Corp.*,
  411 F. Supp. 2d 862 (S.D. Ohio 2005) ......................................................19

*Henry v. Express Scripts Holding Co.*,
  Civ. A. No. 14-2979, 2015 WL 790581 (D.N.J. Feb. 24, 2015) .......................13

*Hodzic v. FedEx Package Sys.*,
  Civ. A. No. 15-956, 2016 U.S. Dist. LEXIS 148067 (W.D. Pa. Oct.
  26, 2016) ...................................................................................................14

*Hoffman La-Roche, Inc. v. Sperling*,
  493 U.S. 165 (1989) ..............................................................................12, 30

*Lovett v. SJAC Fulton Ind I, LLC*,
  Civ. A. No. 14-983, 2015 U.S. Dist. LEXIS 80947 (N.D. Ga. June
  23, 2015) ...................................................................................................21

*Moore v. PNC Bank, N.A.*,
  2013 U.S. Dist. LEXIS 74845 (W.D. Pa. May 29, 2013) .....................14, 17, 18

*Murray v. Stuckey's, Inc.*,
  939 F.2d 614 (8th Cir. 1991) ......................................................................20

# TABLE OF AUTHORITIES
### (CONTINUED)

**Page(s)**

## Cases

*Pickering v. Lorillard Tobacco Co.*,
    Civ. A. No. 10-633, 2012 U.S. Dist. LEXIS 10421 (M.D. Ala. Jan
    30, 2012) ....................................................................................................18

*Postiglione v. Crossmark, Inc.*,
    Civ. A. No. 11-960, 2012 U.S. Dist. LEXIS 163615 (E.D. Pa. Nov.
    14, 2012) ....................................................................................................13

*Reed v. Empire Auto Parts, Inc.*,
    Civ. A. No. 13-5220, 2015 WL 761894 (D.N.J. Feb. 23, 2015) ..................10, 28

*Ritzer v. UBS Fin. Servs. Inc.*,
    Civ. A. No. 08-01235, 2008 U.S. Dist. LEXIS 71635, 2008 WL
    4372784 (D.N.J. Sept. 22, 2008) ..........................................................29

*Shaia v. Harvest Mgmt. Sub LLC*,
    306 FRD 268 (N.D. Cal. 2015)..............................................................30

*Sloane v. Gulf Interstate Field Servs. Inc.*,
    Civ. A. No. 16-01571, 2017 U.S. Dist. LEXIS 43088 (M.D. Pa.
    Mar. 24 2017)............................................................................13, 14, 15, 32

*The Steamship Styria v. Morgan*,
    186 U.S. 1 (1902)............................................................................13

*Symczyk v. Genesis HealthCare Corp.*,
    656 F.3d 189 (3d Cir. 2011) ................................................................13

*Tahir v. Avis Budget Group, Inc.*,
    Civ. A. No. 09-3495, 2011 U.S. Dist. LEXIS 37279 (D.N.J. Apr. 6,
    2011) .......................................................................................................28

*Trinh v. JP Morgan Chase & Co.*,
    Civ. A. No. 07-1666, 2008 U.S. Dist. LEXIS 33016 (S.D. Cal.
    Apr. 22, 2008)........................................................................................18

# TABLE OF AUTHORITIES
### (CONTINUED)

**Page(s)**

**Cases**

*Vogt v. Texas Instruments, Inc.*,
  Civ. A. No. 05-2244, 2006 WL 4660133 (N.D. Tex. Aug. 8, 2006) .................12

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011)...................................................................................10

*Wang v. Chapel LLC*,
  Civ. A. No. 15-2950, 2017 U.S. Dist. LEXIS 132501 (D.N.J. Aug.
  18, 2017) .......................................................................................................14

*West v. Border Foods, Inc.*,
  Civ. A. No. 05-2525, 2006 U.S. Dist. LEXIS 96963 (D. Minn. July
  12, 2006) .......................................................................................................19

*Williams v. Accredited Home Lenders, Inc.*,
  Civ. A. No. 05-1681, 2006 U.S. Dist. LEXIS 50653 (N.D. Ga.,
  July 25, 2006)................................................................................................11

*Wright v. Lehigh Valley Hosp.*,
  Civ. A. No. 10-431, 2010 WL 3363992 (E.D. Pa. Aug. 24, 2010) ...................18

**Statutes**

29 U.S.C. § 207(a)(1)..........................................................................................6

29 U.S.C. § 213 ...................................................................................................6

29 U.S.C. § 216(b) .........................................................................................7, 10

# TABLE OF AUTHORITIES
### (CONTINUED)

**Page(s)**

**Other Authorities**

29 C.F.R. § 541.106(a)..............................................................................20

29 C.F.R. § 541.100(a)(1)-(4)...................................................................16

29 C.F.R. § 541.200(a)(1)-(3)...................................................................16

29 C.F.R. § 541.708..................................................................................16

Federal Rule Of Civil Procedure 83(b)...............................................12, 13

## I.    INTRODUCTION

Plaintiffs Zachary Given, Kristopher Lawson, Vincent McCleery, and Sean McMurran each worked as an Operations Manager ("OM") for Love's Travel Stops & Country Stores, Inc. Each was terminated for behavior impugning his veracity or judgment. Each then sued Love's, claiming Love's (1) misclassified OMs as exempt from the overtime requirements of the Fair Labor Standards Act ("FLSA") and thus (2) owes him overtime premiums. Plaintiffs' success will turn largely on whether a factfinder believes they were ersatz managers who merely "perform[ed] work that require[d] little skill." (ECF 33, p. 3). Between the Rule 26(f) conference on September 15 and November 8, however, no Plaintiff served discovery to prove this assertion.

Despite the languor with which Plaintiffs have pursued their own interests, they now seek to represent at least 1,929 other people. Plaintiffs ask that the Court enjoin Love's, on 10 days' notice, to turn over the names, addresses, telephone numbers, social security numbers, and e-mail addresses of the (at least 1,929) people who worked as an OM since July 18, 2014 and then compel notice to those individuals, so they can join as "opt ins" and be represented by Plaintiffs at a collective trial.

The Court should exercise its discretion to deny Plaintiffs' motion: (1) Plaintiffs have not shown, and could never show, that liability to all OMs could be

determined based on common evidence; (2) granting Plaintiffs' request would inflict substantial harm on Love's, the privacy of at least 1,929 people, and the Court; and (3) Plaintiffs' character flaws and lethargic prosecution of their own claims render them unsuited to represent a collective whose success or failure would hinge on Plaintiffs' credibility and conscientiousness.

## II.   STATEMENT OF FACTS

### A.   Six To 11 Team Members Typically Work On A Shift

Love's operates 437 retail locations in 41 states providing motorists with 24-hour access to gasoline, diesel fuel, compressed natural gas, travel items, electronics, and food items. (Exh. A, Bennison Decl., ¶ 3). Each location is different. Some locations offer one to three restaurant concepts, while others have no restaurant. (Exh. A, Bennison Decl., ¶ 3). Some locations have a tire shop; some do not. (Exh. A, Bennison Decl., ¶ 3). Approximately four locations offer on-site storage rental. (Exh. A, Bennison Decl., ¶ 3).

Twenty to 40 employees, or "team members," typically work at a Love's facility. (Exh. A, Bennison Decl., ¶ 4). The most senior is the General Manager, of whom there is (almost always) one per location. (Exh. A, Bennison Decl., ¶ 4). Next are the OMs, of whom there are usually one or two per location. (Exh. A, Bennison Decl., ¶ 4). All other team members at a location are junior, and answer, to OMs. (Exh. A, Bennison Decl., ¶ 4). There are three shifts per location, with

2

(usually) between six and 11 team members per shift, depending on what type of, and how many, services a facility offers. (Exh. A, Bennison Decl., ¶ 4).

**B.    Operations Managers Direct All Team Members On A Shift And Are Critical To Hiring And Firing**

On a typical shift, the highest ranking manager at a facility is the OM, who supervises all on duty. (Exh. A, Bennison Decl., ¶ 5). When running a shift, the OM's chief responsibility is to supervise the entire operation. (Exh. A, Bennison Decl., ¶ 5). These are some of the chief characteristics of an OM's role:

- At the beginning of a shift, the OM tells each team member what to do.

- During the shift, the OM redistributes team members, or releases team members to avoid incurring overtime, as business needs dictate.

- During the shift, the OM ensures safety and order. This responsibility runs from the quotidian (*e.g.,* ensuring team members stay in uniform and follow Love's directives, ensuring adequate supplies, issuing verbal discipline) to the unusual (*e.g.,* dealing with suspected shoplifters, issuing written discipline, investigating and responding to cash shortfalls).

- OMs always carry a radio to direct other team members on their shift. Monitoring that radio and directing team members is a function OMs perform virtually 100% of the time they are leading their shifts.

3

Sometimes OMs pitch in with tasks their subordinates perform, such as stocking shelves. But, even when an OM performs such a role, that OM is *always* monitoring the radio and surrounding operations, and the OM's primary duty is *always* to ensure the entire operation runs smoothly.

- OMs are usually one of two managers who interview job applicants, and OMs' views on whether to hire those applicants are almost always followed. OMs also have great input into whether to fire team members, and have great input into team members' evaluations, which influence raises and promotions.

(Exh. A, Bennison Decl., ¶ 5). Because the composition of the operation varies from location to location, however, an OM's specific managerial duties will vary from location to location. (Exh. A, Bennison Decl., ¶ 6).

### C.    Each Plaintiff Is A Former Operations Manager Who Left Love's In Circumstances Impugning His Veracity Or Judgment

Mr. Given worked from February 2014 to December 2015. Love's terminated his employment for a policy violation involving the misappropriation of Love's property. (Exh. A, Bennison Decl., ¶ 7). The point is not disputed: on November 25, 2015, Mr. Given signed a Subject Statement in which he admitted to misappropriating Love's property and violating Love's procedures. (Exh. A, Bennison Decl., ¶ 7, and attached Exh. 1, Subject Statement). On, March 25, 2016,

4

Mr. Given pleaded guilty to a first-degree misdemeanor. (*See* Request for Judicial Notice, Exhibits B and C, Given Criminal Case Documents filed herewith).

Mr. McCleery worked as an OM from September 2015 to August 2016. He abandoned his OM job at Love's after he received progressive coaching action that same day related to his attendance. (*See* Exh. A, Bennison Decl. ¶ 8, and attached Exh. 2, McCleery Progressive Coaching).

Mr. Lawson worked as an OM from April 2014 to June 2016. He was written up three times for violations of Love's cash-handling policy (*See* Exh. A, Bennison Decl. ¶ 9, and attached Exh. 3, Lawson Progressive Coaching). On July 27, 2015, Mr. Lawson was disciplined for failing to verify the shift-ending deposit before finalizing it (he never knew money was missing); on September 10, 2015, he was disciplined because he left money unaccounted for and did not balance his deposit; and, on January 19, 2016, he was disciplined for not making any bank deposits while his General Manager was out of the office at Love's training. (*See* Exh. A, Bennison Decl. ¶ 9, and attached Exh. 3, Lawson Progressive Coaching).

Mr. McMurran worked as an OM from August of 2008 to October of 2015. He was involuntarily terminated for leaving keys to the store and the combination to the safe with a cashier unauthorized to have control of the money. (*See* Exh. D, Savoie Decl. ¶¶ 7-10). This was after a history of progressive coaching and

disciplinary action for, among other things, insubordination. (*See* Exh. A, Bennison

Decl. ¶ 10, and attached Exh. 4, McMurran Progressive Coaching).

## III.   PROCEDURAL HISTORY

### A.   On July 18, 2017, Plaintiffs Alleged Love's Misclassified Operations Managers As Exempt From The FLSA's Overtime Requirement And Thus Owes Them Overtime Premiums

Generally, the FLSA dictates "no employer shall employ any of his

employees . . . for a workweek longer than forty hours unless such employee

receives compensation for his employment in excess of the hours above specified

at a rate not less than one and one-half times the regular rate at which he is

employed." 29 U.S.C. § 207(a)(1). The rule is, however, subject to exceptions for

managers who meet certain criteria. *See* 29 U.S.C. § 213. Because Love's classifies

its OMs as skilled managers and exempt from the FLSA's overtime requirement,

Loves pays OMs a salary, and does not pay them overtime premiums.

According to Plaintiffs, "the classification of Operations Managers as

'exempt' employees under the FLSA was wrongful because they perform[ed] work

that require[d] little skill." (ECF 33, p. 3.) In this lawsuit, therefore, Plaintiffs seek

overtime premiums.

### B.   Since September 15, 2017, Discovery Has Been Ongoing

Plaintiffs' assertion that "discovery ha[d] not commenced" (ECF 33, p. 12)

as of October 16, 2017 is puzzling. On September 15, 2017, the parties had a Rule

26(f) conference; on September 27, 2017, Love's served Plaintiffs with interrogatories, document requests, and requests for admission (Exhs. E to H, Love's Discovery to Plaintiffs); by October 2, 2017, the parties exchanged initial disclosures (Exhs. I to J, Plaintiffs' and Defendants' Initial Disclosures); on November 2, 2017, defense counsel first contacted Plaintiffs' counsel about scheduling Plaintiffs' depositions; on November 8, 2017, Plaintiffs first served written discovery; and, on November 10, 2017, Plaintiffs responded to discovery. (Exhs. K to N, Plaintiffs' Discovery Responses).

**C.     On October 16, 2017, Plaintiffs Moved For Conditional Certification, Seeking The Social Security Numbers, Addresses, Telephone Numbers, And Emails Of More Than 1,929 Current Or Former Operations Managers**

Under 29 U.S.C. § 216(b), a lawsuit may proceed to a collective trial if the named Plaintiffs prove they and the members of the collective are "similarly situated," which means a fair judgment can be achieved based on representative evidence. 29 U.S.C. § 216(b). On October 16, 2017, in their Motion for Conditional Certification, Plaintiffs[1] invoked § 216(b) and asked the Court to

---

[1] In their motion, Plaintiffs define the term "Plaintiffs" to include ten individuals who filed forms in which they consented to opt in to the lawsuit under 29 U.S.C. § 216(b). (ECF 33, p. 1). However, the only parties plaintiff, and the only movants before the Court, are the four named Plaintiffs. The ten "opt ins" are simply nonparties. In *Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523 (2013), the Court held that "all of these conditions-(1) conditional certification, (2) notice to purported opt-ins, and (3) the filing of consents to join-are required for opt-ins to become parties to the action." *Beery v. Quest Diagnostics, Inc*., No. 12-cv-00231,

permit them to prosecute their FLSA claim for "all persons currently or formerly employed by Defendant as Operations Managers in the United States at any time from July 18, 2014 to the entry of judgments in this case." (ECF 33, p.3.) Plaintiffs assert their experiences performing mainly non-managerial tasks were materially identical to the experiences of all other OMs, rendering a collective trial efficient. (ECF 33, pp. 14-15).

To support that conclusion, Plaintiffs offer only the declarations of themselves and eight other former OMs – even though there are at least 1,929[2] OMs in the collective Plaintiffs envision. (Exh. A, Bennison Decl., ¶ 11). (*See* ECF 33-6 – 33-13). Each declaration can fairly be paraphrased: "I spent most of my day performing manual tasks and had no real authority. I think all other OMs were like me." No declarations, however, controvert the bullet points in § II(B). Nor do the declarations state the witnesses know of any experience outside the facilities where they worked.

---

2013 WL 3441792, at *3 (D.N.J. July 8, 2013). Further, those conditions must occur in that order before any individual becomes a party to a collective action. *Id*. It follows that any consent form filed before conditional certification and notice is a nullity: such a form does not confer party status on the individual who files it. *See id*.).

[2] Between March 11, 2015 (when the company switched to its current payroll system) and now, Love's knows that at least 1,929 persons served at OMs in that period. There are likely additional persons who worked as OMs between July 18, 2014 and March 10, 2015. To get the data from July 18, 2014 to March 10, 2015, however, would be burdensome, because Love's cannot readily access the prior data. (Exh. O, Cassil Decl).

The first step in Plaintiffs' attempt to prosecute this case as a collective action is the issuance of notice to the members of their proposed collective. Toward that end, Plaintiffs move the Court to enjoin Love's – on 10 days' notice – to turn over to three class-action law firms the names, addresses, telephone numbers, *social security numbers*, and work and personal e-mail addresses of at least 1,929 people. (ECF 33, p. 17). Plaintiffs also request the Court to enjoin the parties to agree upon a form of notice to those individuals, including notice and a reminder by both mail and email, so they may be informed of the lawsuit and given the opportunity to join as "opt ins." (*See* ECF 33, pp. 17-18).

## IV.   STATEMENT OF THE QUESTION INVOLVED

Should the Court exercise its discretion to force Love's to divulge to three class-action law firms the names, addresses, telephone numbers, *social security numbers*, and e-mail addresses of more than 1,929 people, and then require notice of, and the chance to join, this lawsuit to those persons, where Plaintiffs have failed to demonstrate that liability as to those individuals can be proven based on common evidence and where Plaintiffs have impugned their fitness to serve as adequate representatives?

## V. ARGUMENT

### A. Whether To Enjoin Love's To Divulge To Three Class-Action Firms Private Contact Information For 1,929 People, And Then Require Notice Of This Lawsuit To Those Persons, Is Committed To This Court's Broad Discretion

#### 1. Plaintiffs Seek An Invasive Injunction, But Do Not Identify The Governing Rule Of Civil Procedure

Generally "litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011). Section 216(b) provides a limited exception, under which the Court *may* allow named plaintiffs to sue for other individuals if, and only if, they first prove that the other individuals are "similarly situated" to them, so the named plaintiffs and those individuals would present an efficient unit for trial. 29 U.S.C. § 216(b). Courts typically require such named plaintiffs to clear two hurdles.

*First*, they must establish an entitlement to "conditional certification." *Reed v. Empire Auto Parts, Inc.*, No. 13-5220, 2015 WL 761894, at *4 (D.N.J. Feb. 23, 2015). To do so, named plaintiffs must establish that they and the putative collective are "similarly situated." At this phase, the movant(s) must adduce evidence supporting the conclusion that "the claims of the putative class can be proven through common evidence, versus individualized testimony." *Id.* (quoting *Banks v. RadioShack Corp.*, Civ. A. No. 13-0685, 2014 WL 1724856, at *2 (E.D. Pa. Apr. 25, 2014)). If the movant clears this hurdle, there will be court-supervised notice to the putative collective, which will then be allowed to "opt in" to the suit.

10

Usually, courts granting conditional certification also allow broader, collective-oriented discovery. *See Williams v. Accredited Home Lenders, Inc.*, No. 1:05-CV-1681-TWT, 2006 U.S. Dist. LEXIS 50653, at *12 n.4 (N.D. Ga., July 25, 2006) (conditional certification frequently subjects employers to "mind-boggling" discovery).

*Second*, after the close of that discovery, the named plaintiffs must obtain a "conclusive determination" from the Court that "each plaintiff who has opted in to the collective action is similarly situated to the named plaintiff[s]." *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 729 F.3d 239, 243 (3d Cir. 2013).

The present motion is for "conditional certification." To facilitate notice, Plaintiffs seek the injunction described in § III(C).[3] Plaintiffs, however, never identify the Rule of Civil Procedure authorizing the injunction they request. Plaintiffs' omission is significant, because an examination of the applicable Rule reveals that whether to grant that injunction is committed to the Court's sound discretion. Where, as here, a court is asked to enter an injunction based on judicial discretion, that court should issue the injunction only if, based on the particular circumstances, the injunction would be equitable.

---

[3]Plaintiffs never use the word "injunction," but such an order would be an injunction. *See* Black's Law Dictionary 784 (1990) (An injunction is an order "requiring a person to whom it is directed to do or refrain from doing a particular thing.").

### 2. Federal Rule Of Civil Procedure 83(b) Allows The Court To Grant Or Deny The Injunction Plaintiffs Request At The Court's Discretion

The Court's power to grant or deny conditional certification stems from Federal Rule of Civil Procedure 83(b). *Hoffman La-Roche, Inc. v. Sperling*, 493 U.S. 165, 170-72 (1989) (discussing Fed. R. Civ. P. 83 and how it "endorses measures to regulate the actions of the parties to a multiparty suit.").[4] Rule 83(b) provides that, where there is no controlling law, "[a] judge *may* regulate practice in any manner consistent with federal law, rules adopted under 28 U.S.C. §§ 2072 and 2075, and the district's local rules." Fed. R. Civ. P. 83(b) (emphasis added).

Rule 83(b) allows – but does not require – district courts to "regulate their practice in any manner not inconsistent with" the Federal Rules of Civil Procedure. 12 Charles Alan Wright et al, Federal Practice and Procedure § 3155 (2014 & Supp. 2016). When proceeding under Rule 83(b), therefore, the Court must engage in "difficult, case-by-case adjudication." *Id.* at n. 2 (quoting Note, Rule 83 and the Local Federal Rules, 67 Col. L. Rev. 1251 (1967)). The Rule 83(b) power is not to be used promiscuously or formulaically, on the ground that the harms caused by an error would be insignificant. *See id.*

---

[4] *Accord Billingsley v. Citi Trends, Inc.*, 560 Fed. Appx. 914, 921 (11th Cir. 2014); *Buenaventura v. Champion Drywall, Inc.*, No. 2:10-cv-00377-LDG (RJJ), 2012 U.S. Dist. LEXIS 41390, at **29-30 (D. Nev. Mar. 27, 2012); *Davis v. Westgate Planet Hollywood Las Vegas, LLC*, Civ. A. No. 2:08-cv-00722, 2009 WL 5038508, at *5 (D. Nev. Dec. 15, 2009); *Vogt v. Texas Instruments, Inc.*, Civ. A. No. 3:05-cv-2244-L, 2006 WL 4660133, at *2 (N.D. Tex. Aug. 8, 2006).

What is true in general is also true in the specific context of requests for conditional certification under Rule 83(b). The word "may" in Rule 83(b) connotes that the Court should use its power to grant conditional certification *at its discretion. See Symczyk v. Genesis HealthCare Corp.*, 656 F.3d 189, 193 n.5 (3d Cir. 2011) (power to issue notice to collective is a matter committed to the Court's "broad discretion").[5]

Because the present motion invokes the Court's broad discretion, there is no inflexible tenet dictating the outcome or methodology. The two-step approach discussed above is "nowhere mandated," *Sloane v. Gulf Interstate Field Servs. Inc.* No. 4:16-cv-01571, 2017 U.S. Dist. LEXIS 43088, at *15 (M.D. Pa. Mar. 24 2017) (quoting *Symczyk*, 656 F.3d at 193), and nothing requires the Court to grant conditional certification liberally, or stingily, or anywhere between, *see The Steamship Styria v. Morgan*, 186 U.S. 1, 9 (1902) ("The term 'discretion' implies the absence of a hard-and-fast rule.  The establishment of a clearly defined rule of action would be the end of discretion. . . ."  ) (internal punctuation omitted).

In the teeth of these principles, Plaintiffs insinuate that the Court should rubber-stamp their motion under a "lenient," "modest factual showing" standard. (ECF 33, p. 11.) When district courts have used their discretion to apply that

---

[5] *Accord Henry v. Express Scripts Holding Co.*, Civ. A. No. 14-2979, 2015 WL 790581, at *1 (D.N.J. Feb. 24, 2015) (whether to issue notice is a matter of judicial discretion); *Postiglione v. Crossmark, Inc.*, Civ. A. No. 11-960, 2012 U.S. Dist. LEXIS 163615, at *9 (E.D. Pa. Nov. 14, 2012) (same).

standard, however, they have typically done so where the motion precedes the movant's ability to take discovery. Where, as here, discovery has "been made available to the plaintiff," courts have typically applied a more searching standard of review to determine whether the named plaintiffs have proven they are similarly situated to members of the proposed collective. *Sloane*, 2017 U.S. Dist. LEXIS 43088, at *14. The movant often loses.[6]

### B.    The Court Should Not Force Love's To Divulge Names, Social Security Numbers, Etc. Of 1,929 People, And Then Require Notice Of This Lawsuit To Those Persons

The critical question is whether Plaintiffs established that liability can be decided on the basis of common evidence, such that a collective trial would be efficient and fair.[7] There are three reasons the answer is "no": (1) Plaintiffs have not shown, and could never show, that liability to all OMs could be determined on common evidence; (2) granting Plaintiffs' request would harm Love's, the privacy of thousands of people, and the judicial system; and (3) Plaintiffs' character flaws and tepid pursuit of their own claims render them unsuited to represent a collective whose success or failure would hinge on the credibility of Plaintiffs' testimony

---

[6] *See, e.g., Wang v. Chapel LLC,* Civil Action No. 15-2950, 2017 U.S. Dist. LEXIS 132501, at *9 (D.N.J. Aug. 18, 2017); *Sloane*, 2017 U.S. Dist. LEXIS 43088, at *37; *Hodzic v. FedEx Package Sys.,* Civil Action No. 15-956, 2016 U.S. Dist. LEXIS 148067, at *29 (W.D. Pa. Oct. 26, 2016); *Bramble v. Wal-Mart Stores, Inc.*, No. 09-4932, 2011 U.S. Dist. LEXIS 39457, at *16 (E.D. Pa. Apr. 11, 2011).

[7] *E.g., Moore v. PNC Bank, N.A.*, 2013 U.S. Dist. LEXIS 74845, at *11 (W.D. Pa. May 29, 2013) (analyzing plaintiff's "claims to have uncovered the following 'common evidence'" that could lead to a common answer on liability).

14

about their primary job duties and Plaintiffs' diligence.

      **1.**      **Plaintiffs Have Not Shown, And Could Never Show, That Liability Could Be Determined On The Basis Of Common Evidence**

            **a.**      **Liability Turns On Whether OMs Have Primarily Non-Managerial Duties**

Whether a particular employee is misclassified under the FLSA depends on whether the employee's (1) compensation and (2) duties satisfy the exemptions(s) on which the employer relies. 29 C.F.R. § 541.2. Where, as here, the first element is not in dispute,[8] liability to a collective is possible based on common evidence if, and only if, the named Plaintiffs and members of the putative collective have materially the same, primarily non-managerial, job duties. Those duties must be examined through the prism of the exemptions at issue, here the executive, administrative, and combination exemptions. *See, e.g., Sloane*, 2017 U.S. Dist. LEXIS 43088, at *42 ("The…exemptions will be relevant to the proper disposition of this case. The Court will have to consider each of the pertinent elements (primary duty, discretion, etc.), as they apply to each potential claimant.").

The executive exemption applies to employees (1) whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (2) who customarily

---

[8] Plaintiffs admit they were always paid a salary exceeding $455 per week. (Exhs K to N, Given's, McMurran's, Lawson's, and McCleery's Responses to Love's Requests for Admission, No. 1).

and regularly direct the work of two or more other employees; and, (3) possesses the authority to hire or fire other employees or whose suggestions and recommendations on the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. 29 C.F.R. § 541.100(a)(1)-(4). The administrative exemption applies to employees whose primary duty includes "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(1)-(3). The combination exemption applies to employees who "perform a combination of exempt duties as set forth in the regulations" relating to the exemptions. 29 C.F.R. § 541.708. As discussed below, Plaintiffs have made no showing that it could be determined based on common evidence whether all OMs meet these exemptions.

> **b.** **Plaintiffs Point To No Common Evidence That OMs Nationwide Have Materially The Same, Primarily Non-Managerial Duties**

Plaintiffs offer two types of evidence to support the conclusion all OMs performed common, non-managerial job duties: (1) that OMs are subject to common policies, training, and pay practices; and (2) Plaintiffs, personally, often performed menial tasks and did not have "ultimate" authority over hiring, firing, and discipline. (ECF 33, pp. 1-7). Neither form of evidence, however, suggests all OMs have materially the same, primarily non-managerial job duties.

### (i) Evidence That OMs Are Subject To Common Policies, Training, And Pay Practices Does Not Suggest They Had The Same, Primarily Non-Managerial Duties

Plaintiffs claim OMs had similar policies and training, worked in locations that adhered to common standards, had a common job description, and were subject to the same exemption decision. (ECF 33). All of those assertions are true, and all are irrelevant, because none could support the conclusion that all OMs performed the same, primarily non-managerial duties.

Illustrating the point is *Moore v. PNC Bank, N.A*, where, on a motion for conditional certification, the plaintiff relied on the same evidence on which Plaintiffs here attempt to rely.

| Plaintiffs' Evidence | Parallel Evidence In *Moore* |
|---|---|
| "Love's business model and its meticulously cultivated brand depend on top-down control over its store operations to ensure that each store in the chain operates uniformly nationwide, regardless of location." (ECF 33, p.4.) | Defendant's "common retail . . . hierarchy." *Moore v. PNC Bank, N.A.*, 2013 U.S. Dist. LEXIS 74845, at *11 (W.D. Pa. May 29, 2013). |
| "Love's has established detailed procedures for all of its stores to implement uniform operations. . . ." (ECF 33, p.4.) | Defendant's "detailed companywide policies." *Id.* at *12. |
| "All OMs are subject to the dictates of Love's Store Operations." (ECF 33, p.4.) | Defendant "ensure[d] that all branches [we]re uniformly operated." *Id.* |
| "Love's Job Description states under | Defendant "instruct[ed] all [putative |

| | |
|---|---|
| Essential Functions that all OMs must utilize the LMS (Learning Management System) and other training tools to verify that training is 'complete and consistent.'" (ECF 33, p.4.) | class members] to complete mandatory corporate training courses." *Id.* |
| "Defendant's job description for the OM position is consistent and identically applied." (ECF 33, p.4.) | Defendant used a "common job posting that [wa]s . . . to describe every" vacancy for this position. *Id.* |
| OMs "were subject to the same pay practices." (ECF 33, p.3) | Defendant "maintain[ed] an across-the-board exemption policy for" this position. *Id.* at *11. |

Nevertheless, because there was no indication these factors caused the putative class members to perform the same, primarily non-managerial job duties, the *Moore* court denied conditional certification. *See Moore*, 2013 U.S. Dist. LEXIS 74845, at **16-18. This Court should reach the same result.[9]

---

[9] Other cases that embrace the same principles. For example, other cases establish that "the alleged application of a uniform policy does not, without more, show that potential class members are similarly situated." *Asirifi v. W. Hudson Sub-Acute Care Ctr., LLC* No. 11-04039, 2014 WL 294886, at *3 (D.N.J. Jan. 24, 2014); *see Wright v. Lehigh Valley Hosp.,* No. 10-431, 2010 WL 3363992, at *4 (E.D. Pa. Aug. 24, 2010). And other cases establish that "a standardized job description is insufficient to justify a nationwide collective action based upon a claim that the employer improperly classified a category of employees as exempt." *Pickering v. Lorillard Tobacco Co.,* No. 10-cv-633, 2012 U.S. Dist. LEXIS 10421, at *34 (M.D. Ala. Jan 30, 2012); *see Trinh v. JP Morgan Chase & Co.,* No. 07-cv-1666, 2008 U.S. Dist. LEXIS 33016, at *13-14 (S.D. Cal. Apr. 22, 2008).

### (ii)    Evidence Plaintiffs, Or Other OMs, Performed Non-Exempt Tasks Does Not Suggest They Had The Same, Primarily Non-Managerial Duties

Plaintiffs rely on their declarations and those of eight other OMs who claim they spent a large majority of their time performing non-managerial tasks, without explaining whether they were concurrently performing managerial tasks. The declarations also claim OMs lack "ultimate" authority over hiring, firing, and discipline. There are three fundamental problems with Plaintiffs' reliance on these 12 declarations.

*First,* declarations from 12 OMs – out of a universe of at least 1,929 OMs – are too few to suggest that all members of the proposed collective worked primarily non-managerial job duties. *See West v. Border Foods, Inc*., No. 05-2525, 2006 U.S. Dist. LEXIS 96963, at *19 (D. Minn. July 12, 2006) (denying conditional certification where declarations from six shift managers only represented approximately 2.5 percent of the potential collective); *Harrison v. McDonald's Corp*. 411 F. Supp. 2d 862, 870-71 (S.D. Ohio 2005) (two affidavits for potential class of 300 insufficient).

*Second*, the omission from the declarations of any discussion of concurrent duties renders the declarations substantively useless on the "primary duty" analysis for the executive exemption. Plaintiffs rely on the declarations to support the *non sequitur* that they "spent the majority of their time doing the work of hourly

employees," and therefore did not have the primary duty of management. (ECF 33, p.5). Plaintiffs' premise, however, cannot support their conclusion, because an OM could spend the majority of his time doing the work of an hourly employee *and* have the primary duty of management:

> [T]the person 'in charge' of a store has management as his primary duty, even though he spends the majority of his time on non-exempt work and makes few significant decisions.

*Murray v. Stuckey's, Inc.*, 939 F.2d 614, 618 (8th Cir. 1991); *see* 29 C.F.R. § 541.106(a) ("Concurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the [other regulatory criteria] are otherwise met."). Thus, if the employee retains supervisory and managerial responsibility even while performing nonexempt work, that employee is properly exempt. *See id.*

*Third*, Plaintiffs' reliance on their declarations for the proposition that OMs lack "ultimate" responsibility over hiring, firing, and discipline (ECF 33, p. 7) is misplaced. What matters for the final prong of the executive exemption is not whether the individual has "ultimate" authority over those issues; what matters is whether that individual's suggestions and recommendations on the hiring, firing, advancement, promotion or any other change of status of other employees are given "particular weight." An individual without "ultimate decision-making authority" with respect to hiring, firing and change of status of employees, but

whose recommendations are given "particular weight," may nonetheless be exempt. *Cooney v. City of Chicago*, 644 F. Supp. 2d 1061, 1071 (N.D. Ill. June 12, 2009); *accord Frey v. Spokane County Fire Dist. No. 8*, 05-289, 2006 U.S. Dist. LEXIS 64538, *29 (E.D. Wash. Sept. 11, 2006).

Because Plaintiffs pointed to no evidence supporting the conclusion all OMs lacked (1) supervisory and managerial responsibility while performing nonexempt work or (2) "particular weight" over changes in employment status, the Court should deny Plaintiffs' motion.[10] But Plaintiffs' problems go deeper: it would be impossible for Plaintiffs to adduce such evidence.

### c.   Plaintiffs Could Not Possibly Point To Common Evidence That OMs Nationwide Have Materially The Same, Primarily Non-Managerial Duties

There are two reasons Plaintiffs *cannot* point to common evidence that all OMs have materially the same, primarily non-managerial duties: (i) Plaintiffs' discovery responses make clear that they have no idea whether this conclusion is true; and (ii) Love's declarations establish that it could not possibly be true.

---

[10] *See Brown v. Barnes & Noble, Inc.*, No. 16-cv-07333, 2017 U.S. Dist. LEXIS 67148, **15-18 (S.D.N.Y. May 2, 2017) (denying conditional certification where plaintiffs failed to address whether, in addition to "nonexempt" duties, they also performed managerial duties); *Lovett v. SJAC Fulton Ind I, LLC*, No. 1:14-cv-983-WSD, 2015 U.S. Dist. LEXIS 80947, at *41-42 (N.D. Ga. June 23, 2015) ("general statements [regarding non-managerial work], without more, are insufficient to support Plaintiff's assertion that she and the proposed class members are similarly situated because all Assistant Managers perform non-managerial duties are therefore categorically misclassified as exempt from the FLSA's overtime pay requirements.").

### (i)    Plaintiffs Admit They Have No Idea Whether "Similarly Situated" OMs Exist

One of the Complaint's most critical assertions is paragraph 73, where Plaintiffs allege "[t]here are numerous similarly situated current and former OMs who have not been paid proper overtime wages." Interrogatory No. 19 asked Mr. Given to "[p]lease state all facts supporting" that conclusion. Mr. Given's answer was this:

> Plaintiff objects to this Interrogatory on the grounds that it is vague, ambiguous, and calls for a legal conclusion with respect to the term "similarly situated." Subject to and without waiving these objections, Plaintiff states that, based on Plaintiffs knowledge and what Plaintiff has experienced and witnessed while working for Defendant, Defendant's OMs are all subject to the same policies, all perform the same primary duties and have the same responsibilities—which are non-exempt, and all regularly work over forty (40) hours per week without overtime compensation due to Defendant's policy of misclassifying OMs as exempt from the overtime protections of the Fair Labor Standers Act. . . .

(Exh. K, Given's Responses to Love's First Set of Interrogatories, No. 19).

We would have expected that, having alleged the existence of "similarly situated" OMs, Plaintiffs would have understood what they meant by the term. But Mr. Given certainly has no idea. He regards the very concept of "similarly situated" OMs as to too "vague" and "ambiguous" to comprehend – *even though he used the very term in his Complaint*. To the extent he can grasp the idea at all, Mr. Given offers a tautology: he knows there are similarly situated OMs because,

well, that is just what he knows. The other Plaintiffs' answers to the same question are materially identical. (*See* Exhs. L to N, McMurran's, Lawson's, and McCleery's Responses to Love's First Set of Interrogatories, No. 19). Thus, Plaintiffs cannot point to common evidence that all OMs have materially the same, primarily non-managerial duties because Plaintiffs have no idea whether that assertion is true. They did not know when they filed their Complaint, and they do not know now.

> **(ii)** **Love's Declarations Show That Not All OMs Have Materially The Same, Primarily Non-Managerial Duties**

Love's declarations establish that many OMs primarily spent their time performing managerial tasks.[11] For instance, at Store 612 in Bridgeton, Missouri, OM Boseman is "the manager running the store, the tire shop and the restaurants."[12] In addition, OM Boseman oversees the storage facility, which is

---

[11] Exh. P, Boseman Decl., ¶ 4 and Exh. Q, Johnson Decl., ¶ 25 – spend 70% of time performing managerial tasks.; Exh. R, Dawkins Decl., ¶ 11 – spend 60% of time performing managerial tasks; Exh. S, Anderson Decl., ¶ 8 – spend 100% of time performing managerial tasks; Exh. T, Baur Decl., ¶¶ 8, 9 – spend 80% of time performing managerial tasks; Exh. U, Westbrook Decl., ¶ 23 – spend 80% of time performing managerial tasks; Exh. V, Hill Decl., ¶ 29 - spend 85% to 90% of time performing managerial tasks; Exh. W, Morgan Decl., ¶ 6 – spend 75% of time performing managerial tasks; Exh. X, Savacool Decl., ¶ 5 – spend 75% of time performing managerial tasks.

[12] Exh. P, Boseman Decl., ¶ 5; See also Exh. S, Anderson Decl., ¶ 7; Exh. Y, Bittner Decl., ¶ 9; Exh. Z, Minutelli Decl., ¶ 5; Exh. T, Baur Decl., ¶ 21; Exh. AA, Hawk Decl., ¶ 14; Exh. W, Morgan Decl, ¶ 4.

unique to his location.[13] OM Boseman is just one illustration of a critical point: even while engaged in physical tasks, *OMs are always managing employees and always focused on the smooth operation of the store*.[14] OMs always carry a radio which they use to communicate with and direct the other members on their shift.[15] As James Minutelli, an OM in Cumberland, Maryland, declared: "When needed, I'll pitch in and perform 'hourly' tasks . . . But, even when I am performing such

---

[13] Exh. P, Boseman Decl., ¶ 5.

[14] Exh. U, Westbrook Decl., ¶ 4 – "My job responsibilities include, among other things, ensuring the store runs smoothly, leading employees, delegating and following up with employees." Exh. BB, Pettis Decl., ¶¶ 15-16 – "Occasionally, GMs and OMs will chip in and help with the duties of hourly employees when it's necessary. . . But, even when an OM is doing these kind of 'chip in' tasks, he is always monitoring the radio and his primary focus remains on ensuring the whole operation is running smoothly." *See also* Exh. CC, Twigg Decl., ¶ 8, "The OM is responsible for making sure everything runs smoothly." Exh. DD, Golladay Decl., ¶ 8 – ". . .Operations Managers oversee and walk the restaurant to ensure that it is operating properly . . ."; *See also* Exh. R, Dawkins Decl., ¶ 8 – "As Operations Manager I was managing the processes and spent a majority of my time making sure that tasks were being performed through my employees."

[15] Exh. BB, Pettis Decl., ¶¶ 15-16 ; *See also* Exh. EE, Jeffcoat Decl., ¶¶ 15, 16 - "Our goal is 'customers first.' When needed, therefore, OMs will pitch in and help with any task in the facility. Sometimes, for example, they'll stock shelves. . . But, even when an OM is pitching in, that person is always monitoring the radio and periodically directing and helping the other employees working that shift. This happens all day long."; *See also* Exh. FF, Cowsert Decl., ¶ 20, "I [and] my OMs sometimes pitch in to help with tasks such as stocking shelves. But, when we do that, we're always monitoring our Motorola radios and supervising the entire facility."; *See also* Exh. GG, Akers Decl., ¶ 14, "I estimate that, as an Operations Manager, I spent 30 to 40 percent of my time performing physical tasks. However, when performing such tasks, I was typically doing so while simultaneously performing my administrative and personnel management functions. . ."; *See also* Exh. HH, Shine Decl., ¶ 7; Exh. U, Westbrook Decl., ¶ 9; Exh. DD, Golladay Decl., ¶ 11; Exh. AA, Hawk Decl., ¶ 18.

tasks, *I'm always monitoring my radio and always managing my people. I never cease to be a manager.*" (Exh. W, Minutelli Decl., ¶ 13 (emphasis added)).

It has to be that way, because an OM is usually the highest level manager on duty[16] and manages several employees at all times.[17] When doing so, OMs reprioritize tasks, depending on the business needs of a particular shift and independently make decisions.[18] OMs follow up with employees and delegate tasks.[19] OMs hold meetings with shift employees.[20] OMs with tire shops, for example, hold a Tailgate Meeting with the employees of the tire shop at the beginning of every shift[21] while the duties of OMs with restaurants include performing "pathing" which consists of ensuring food safety standards are met and

---

[16] Exh. P, Boseman Decl., ¶ 11; Exh. R, Dawkins Decl., ¶ 10; Exh. II, Miller Decl., ¶ 6; Exh. Q, Johnson Decl., ¶ 9; Exh. Y, Bittner Decl., ¶ 13; Exh. EE, Jeffcoat Decl., ¶ 13; Exh. FF, Cowsert Decl., ¶ 17; Exh. Z, Minutelli Decl., ¶¶ 9, 10; Exh. GG, Akers Decl. ¶ 4; Exh. JJ, Barciszewski Decl., ¶¶ 6, 11; Exh. U, Westbrook Decl., ¶ 6; Exh. V, Hill Decl., ¶ 15; Exh. KK, Bowers Decl., ¶ 20.

[17] Exh. T, Baur Decl., ¶ 27; Exh. LL, Zamani Decl., ¶ 23; Exh. U, Westbrook Decl., ¶ 5; Exh. DD, Golladay Decl., ¶ 7; Exh. MM, Vaughan Decl., ¶ 7; Exh. W, Morgan Decl., ¶ 9; Exh. X, Savacool Decl., ¶ 8; Exh. NN, Helman Decl., ¶ 5.

[18] Exh. R, Dawkins Decl., ¶ 16; Exh. Q, Johnson Decl., ¶ 22; Exh. DD, Golladay Decl., ¶ 8; Exh. T, Baur Decl., ¶ 13.

[19] Exh. P, Boseman Decl., ¶¶ 13, 17, 18; Exh. R, Dawkins Decl., ¶¶ 6, 7, 30; Exh. OO, Smith Decl., ¶ 11; Exh. Q, Johnson Decl., ¶¶ 7-8; Exh. S, Anderson Decl., ¶¶ 12, 14; Exh. Y, Bittner Decl., ¶¶ 8, 15; Exh. PP, Friend Decl., ¶¶ 3, 5-6, 8; Exh. EE, Jeffcoat Decl., ¶ 14; Exh. FF, Cowsert Decl., ¶ 27; Exh. Z, Minutelli Decl., ¶¶ 12, 17; Exh. HH, Shine Decl., ¶ 14; Exh. U, Westbrook Decl., ¶ 12; Exh. V, Hill Decl., ¶¶ 8, 18, 22; Exh. KK, Bowers Decl., ¶ 18.

[20] Exh. R, Dawkins Decl., ¶ 14.

[21] Exh. P, Boseman Decl., ¶ 7; Exh. R, Dawkins Decl., ¶ 15; Exh. Q, Johnson Decl., ¶ 5; Exh. T, Baur Decl., ¶ 10.

the restaurant is prepared for the dinner rush.[22]

OMs perform inventory management and submit orders.[23] OMs are responsible for certain safety procedures such as performing pre-trip inspections for the tire shop, environmental compliance in the event of a gas spill, and food safety compliance and food temperature checks.[24] OMs also verbally coach employees, can suspend employees on their shift, and can issue written corrective action.[25] OMs can adjust schedules and have discretion to send an employee home early to avoid incurring overtime.[26]

OMs conduct interviews, make hiring recommendations that are almost always followed, and are involved in the performance evaluation process, which

---

[22] Exh. P, Boseman Decl., ¶ 9; Exh. II, Miller Decl., ¶ 7; Exh. OO, Smith Decl., ¶ 12; Exh. Q, Johnson Decl., ¶ 10; Exh. S, Anderson Decl., ¶¶ 9, 11; Exh. GG, Akers Decl., ¶ 11; Exh. HH, Shine Decl., ¶ 8.

[23] Exh. P, Boseman Decl., ¶ 12; Exh. R, Dawkins Decl., ¶ 20; Exh. OO, Smith Decl., ¶ 15; Exh. FF, Cowsert Decl., ¶ 24; Exh. LL, Zamani Decl., ¶¶ 12, 18; Exh. U, Westbrook Decl., ¶ 11; Exh. DD, Golladay Decl., ¶ 15.

[24] Exh. P, Boseman Decl., ¶ 20; Exh. R, Dawkins Decl., ¶¶ 12, 13; Exh. Q, Johnson Decl., ¶¶ 11, 12; Exh. GG, Akers Decl., ¶ 7; Exh. U, Westbrook Decl., ¶ 7.

[25] Exh. P, Boseman Decl., ¶¶ 30, 31; Exh. R, Dawkins Decl., ¶¶ 23, 25; Exh. II, Miller Decl., ¶ 10; Exh. OO, Smith Decl., ¶ 22; Exh. Q, Johnson Decl., ¶¶ 15, 16, 17, 18; Exh. S, Anderson Decl., ¶¶ 15, 16, 19; Exh. Y, Bittner Decl., ¶¶ 17, 22; Exh. FF, Cowsert Decl., ¶¶ 25, 26, 40; Minutelli, ¶ 16; Exh. GG, Akers Decl., ¶ 13; Exh. T, Baur Decl., ¶ 25; Exh. LL, Zamani Decl, ¶ 14; Exh. U, Westbrook Decl., ¶¶ 15, 16; Exh. V, Hill Decl., ¶¶ 11, 12, 13, 14; Exh. KK, Bowers Decl., ¶¶ 14, 15, 16; Exh. DD, Golladay Decl., ¶ 12; Exh. MM, Vaughan Decl. ¶¶ 11, 12.

[26] Exh. R, Dawkins Decl., ¶ 29; Exh. OO, Smith Decl., ¶ 25; Exh. BB, Pettis Decl., ¶¶ 20, 21; Exh. DD, Golladay Decl., ¶ 24.

dictates team members' pay and promotions.[27] Other than the General Manager, the OM is the only person allowed to process refunds, void transactions, and authorize price overrides.[28] OMs also spend time monitoring loss prevention and conducting cash reconciliation procedures.[29] OMs attend weekly management meetings at which they discuss employee performance issues, financial reports, profit and loss reports, and weekly sales numbers.[30] OMs also participate in Quarterly Business Review meetings and meetings with other OMs in their Division.[31]

It would make no sense to proceed toward a collective trial in which the OMs discussed above, and others above and below them in Love's hierarchy,

---

[27] Exh. P, Boseman Decl., ¶¶ 29, 32; Exh. R, Dawkins Decl., ¶¶ 21, 22, 24; Exh. II, Miller Decl., ¶ 9; Exh. OO, Smith Decl., ¶¶ 8, 21, 23, 24; Exh. Q, Johnson Decl., ¶ 14; Exh. Y, Bittner Decl., ¶¶ 18, 19, 20; Exh. BB, Pettis Decl., ¶ 19, Exh. EE, Jeffcoat Decl., ¶ 19; Exh. FF, Cowsert Decl., ¶¶ 32-39, 41, 42; Exh. Z, Minutelli Decl. ¶ 22; Exh. GG, Akers Decl., ¶ 12; Exh. T, Baur Decl., ¶¶ 24, 26; Exh. LL, Zamani Decl, ¶¶ 13, 15; Exh. U, Westbrook Decl., ¶ 14; Exh. V, Hill Decl., ¶¶ 9, 10; Exh. KK, Bowers Decl., ¶ 17; Exh. DD, Golladay Decl., ¶¶ 21, 22; Exh. W, Morgan Decl., ¶ 5.

[28] Exh. P, Boseman Decl., ¶ 10; Exh. R, Dawkins Decl., ¶ 19; Exh. PP, Friend Decl., ¶ 7; Exh. FF, Cowsert Decl., ¶¶ 22, 30, 31; Exh. T, Baur Decl., ¶ 15.

[29] Exh. P, Boseman Decl., ¶¶ 14, 15; Exh. R, Dawkins Decl., ¶¶ 17. 18; Exh. OO, Smith Decl., ¶ 16; Exh. Q, Johnson Decl., ¶ 23; Exh. FF, Cowsert Decl., ¶ 28; Exh. Z, Minutelli Decl., ¶¶ 18, 20, 21; Exh. T, Baur Decl., ¶ 17; Exh. U, Westbrook Decl., ¶ 8.

[30] Exh. M, Exh. P, Boseman Decl., ¶ 21; Exh. R, Dawkins Decl., ¶ 26; Exh. II, Miller Decl., ¶ 8; Exh. OO, Smith Decl., ¶ 18; Exh. Q, Johnson Decl., ¶ 20; Exh. S, Anderson Decl., ¶ 20.

[31] Exh. OO, Smith Decl., ¶¶ 19-20; Exh. Q, Johnson Decl., ¶ 24; Exh. S, Anderson Decl., ¶ 22; Exh. GG, Akers Decl., ¶ 6

would testify OMs always retained supervisory and managerial responsibility, even while performing nonexempt work. Unless the factfinder concluded these witnesses were flagrantly lying, there would be no way for the factfinder to conclude *all* OMs were misclassified, and the trial would soon become a travesty, requiring a person-by-person examination of managerial responsibility. *See Tahir v. Avis Budget Group, Inc*., Civ. A. No. 09-3495, 2011 U.S. Dist. LEXIS 37279, at *9 (D.N.J. Apr. 6, 2011).

Because of the power of this evidence, Plaintiffs would have the Court blithely dismiss these witnesses as "happy campers" (ECF 33, p. 16) who would casually perjure themselves. At the conditional-certification phase, however, courts often "review[] Plaintiff's evidence in light of the evidence submitted by Defendants," including declarations. *Reed*, 2015 WL 761894, at *3; *see Bramble*, 2011 U.S. Dist. LEXIS 39457, at **19-21 n.6. We respectfully suggest this Court do likewise.

As for Plaintiffs' unfounded attacks on the declarants as "happy campers" who would lie under oath, we would point out that we disclosed these witnesses to Plaintiffs on November 7, 2017, and that we can make every one of these witnesses available for deposition within the next month. If Plaintiffs can then prove that the declarants lied about having primarily managerial duties, Love's will stipulate to issuing notice. For now, however, there is no reason to rush into the

notice and "opt in" process on the casual assumption that these witnesses are lying.

> **2.    Forcing Love's To Provide Personal And Private Contact Information For 1,929 People, And Then Send Those People Notice Of This Lawsuit, Would Inflict Substantial Harm**

Issuing the injunction Plaintiffs request would require Love's, on 10 days' notice, to turn over to Plaintiffs' counsel a list of the names, addresses, telephone numbers, dates of employment, locations of employment, *social security numbers*, and work and personal e-mail addresses of more than 1,929 people. (ECF 33, p. 17). No such list exists. To compile a list of those 1,929 individuals, along with their addresses, telephone numbers, social security numbers, personal email, and work email, if it were possible at all, would involve much time and expense, and conditional certification would then foist upon Defendants "class-related discovery." *Bramble*, 2011 U.S. Dist. LEXIS 39457, at *14. Such discovery would impose "burdens and costs" that are not to be gainsaid. *See Dreyer v. Altchem Env. Servs., Inc.*, Civ. A. No. 06-2393, 2006 U.S. Dist. LEXIS 93846, at *7 (D.N.J. Dec. 12, 2006).

Turning to the rights of third parties, Love's 1,929 current and former OMs have a privacy interest in their social security numbers, which the Court should not force Love's to divulge. *Ritzer v. UBS Fin. Servs. Inc.,* No. 08-01235, 2008 U.S. Dist. LEXIS 71635, 2008 WL 4372784, at *3 (D.N.J. Sept. 22, 2008). Plaintiffs'

request for email notice is similarly unwarranted[32] and Plaintiffs' counsel should not be permitted to contact more than 1,929 third parties via text message or telephone.[33] Moreover, Plaintiffs request for a "reminder" half way into the proposed notice period is unnecessary and should not be allowed. In facilitating notice, the Court must "[avoid] communicating to absent class members any encouragement to join the suit or any approval of the suit on its merits." *Hoffman-La Roche Inc. v. Sperling,* 493 U.S. at 168-69. Courts should be hesitant to authorize duplicative notice because it may unnecessarily "stir up litigation" or improperly suggest the Court's endorsement of plaintiff's claims. *Id.*

Finally, an unwise grant of conditional certification would have negative consequences for the Court. After potentially hundreds of individuals opted in to the lawsuit, and after collective-related discovery, the Court would have to undertake a "specific factual analysis of each [opt-in] employee's claim to ensure that each proposed plaintiff is an appropriate party." *Harris v. Healthcare Servs. Grp., Inc.,* Civ. A. No. 06–2903, 2007 U.S. Dist. LEXIS 55221, at *7 (E.D. Pa. Jul. 31, 2007). Only those individuals whose rights were violated would be able to recover. An imprudently issued notice would force the Court to determine the job

---

[32] *Shaia v. Harvest Mgmt. Sub LLC,* 306 FRD 268, 276 (N.D. Cal. 2015).
[33] *Aguirre v. Tastee Kreme #2, Inc.,* No. H-16-2611, 2017 U.S. Dist. LEXIS 83944, *22-23 (S.D. Tex. Apr. 13, 2017).

duties "of potentially [1,929] of employees." *Bramble*, 2011 U.S. Dist. LEXIS 39457, at *28. Such a proceeding would be "anything but efficient." *Id*.

### 3.   The Named Plaintiffs' Defects In Character And Judgment Would Make Them Poor Representatives Of A Collective

If this case proceeded to a collective trial, the success or failure of OMs' claims would turn on the diligence with which the named Plaintiffs pursued their claims and the plausibility of their testimony. What we know about the named Plaintiffs augurs poorly on both points.

The Plaintiffs' pursuit of their individual claims has been anything but diligent. On the contrary, and despite Love's assiduous pursuit of discovery, Plaintiffs wasted almost two months of the discovery period, and then compounded their torpor with inaccuracy, falsely stating to the Court that "discovery has not commenced" (ECF 33, p. 12). Plaintiffs also asserted in their Complaint that "similarly situated" OMs exist but, when forced to answer interrogatories requiring them to buttress that assertion with facts, pretended that the concept of "similarly situated" OMs was too "vague" for them to comprehend. Which leads to a discussion of Plaintiffs' relationship with the truth.

The named Plaintiffs will have to convince a jury they are telling the truth, and the numerous declarants cited above are lying, on whether *all* OMs primarily perform non-managerial duties. In that context, the veracity and judgment of the named Plaintiffs will become a central issue.  What we know about their veracity

31

and judgment is bad (*see* §II (C)), so bad as to weigh against taking any step toward a collective trial.  *See Sloane*, 2017 U.S. Dist. LEXIS 43088, at \*\*3-4.

## VI.    CONCLUSION

Conditional certification would (1) stir up litigation, potentially inducing to join this lawsuit hundreds of individuals who have no chance of obtaining a judgment at a collective trial; (2) inflict unwarranted harms on Love's, the privacy interests of thousands of people (who would have their social security numbers and other personal data handed over to someone who misappropriated property), and the judicial system; and, (3) saddle any OM who opted into the lawsuit with representatives with disqualifying character flaws.   Because "courts have the responsibility to avoid stirring up litigation through unwarranted solicitation," *Sloane*, 2017 U.S. Dist. LEXIS 43088, at \*17, this Court should deny Plaintiffs' motion.

*/s/ Matthew J. Hank*
Matthew J. Hank (PA No. 86086)
Marc D. Esterow (PA No. 323020) (*pro hac vice admission pending*)
LITTLER MENDELSON, P.C.
Three Parkway, Suite 1400, 1601 Cherry Street
Philadelphia, PA  19102
(267) 402-3000
(267) 402-3131 – fax
mhank@littler.com
mesterow@littler.com

Attorneys for Defendant
Love's Travel Stops & Country Stores, Inc.

Dated:  November 13, 2017

32

## **CERTIFICATE OF COMPLIANCE**

I, Matthew J. Hank, certify that the foregoing Memorandum in Support of Defendant's Opposition to Plaintiff's Motion for Conditional Certification complies with the word-count limit set forth in the Court's Order of November 7, 2017 (ECF 39) in that it contains 8,421 words, as determined by the word count feature of the word-processing system used to prepare this brief.


*/s/ Matthew J. Hank*
Matthew J. Hank

Dated:  November 13, 2017

## **CERTIFICATE OF SERVICE**

I, Matthew J. Hank, certify that I caused the foregoing Memorandum in Support of Defendant's Opposition to Plaintiff's Motion for Conditional Certification, and accompanying documents, to be filed and served via ECF upon all counsel of record.


/s/ Matthew J. Hank
Matthew J. Hank

Dated:  November 13, 2017

34