

**Littler Mendelson, P.C.**
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA 19102.1321

December 9, 2019

Matthew J. Hank
Donald W. Myers
Rachel Fendell Satinsky
267.402.3000 main
267.402.3131 fax
mhank@littler.com
dwmyers@littler.com
rsatinsky@littler.com

**VIA ECF**

The Honorable Martin C. Carlson
United States District Court for the Middle District of Pennsylvania
Ronald Reagan Federal Building & U.S. Courthouse
228 Walnut Street
Harrisburg, PA 17101

> **Re:** *Zachary Given, et al. v. Love's Travel Stops & Country Stores, Inc.*
> **Docket No.:** 1:17-cv-01266-CCC

Dear Judge Carlson:

This is a conditionally certified misclassification case in which (1) liability hinges on whether Operations Managers ("OMs") for Defendant Love's Travel Stops & Country Stores, Inc. ("Love's") performed duties qualifying for the executive or administrative exemptions (or a combination thereof) and (2) Plaintiffs' entitlement to proceed to a collective trial turns on whether the answer to that question can be established on common evidence.  Discovery has been on-going for over two years, and has included Love's production of the entire email accounts for seven facilities at which seven OMs worked ("store-level emails").  The productions of store-level emails alone consist of approximately 380,000 documents.  Those emails, **which include emails between OMs and higher management** (*see, e.g.*, Exh. A), provide a comprehensive insight into day-to-day on goings at Love's and OMs' duties at those locations.

Plaintiffs apparently have not found any "smoking gun" in those emails.  Therefore, now, in the twilight of discovery, Plaintiffs belatedly insist Love's produce even more emails, this time voluminous emails from management *above* the store level.  If Love's were to comply with Plaintiffs' demand for such emails – a demand that does not seem rooted in any particular document request – Love's would be unduly burdened because of the prohibitive expense.  Indeed, the cost to process and review emails from approximately 40 additional custodians would likely cost between $1 and $2 million.  There would be no countervailing benefit to this extraordinary expense:  there is no reason to believe that emails between managers above the store level will provide better or further insight into OMs' job duties than the insights that can be gained from reviewing the seven store-level email collections Love's already produced to Plaintiffs.

Because the parties were unable to agree on these issues, on November 25, 2019, Your Honor ordered that  Love's submit a proposal outlining (1) what Love's would like the Court to direct in terms of discovery production; and (2) Love's position on the proper scope of the production of ESI.  (ECF 218).  Regarding both points, which overlap, Love's proposes the following:

The Honorable Martin C. Carlson
December 9, 2019
Page 2

- Save for three discrete exceptions, discovery should end, as previously agreed, on December 18, 2019. Those exceptions are: (1) Plaintiffs will depose Leonard Court and Courtney Warmington on January 28, 2019; (2) Plaintiffs will respond to Love's First Set of Requests for Admission, Interrogatories, and Document Requests directed to two replacement opt-in Plaintiffs (John James Pickel and Brian Townsend) by December 19, 2019; and (3) Love's will depose opt-in Plaintiff Kelly McMullen by the end of January 2020.[1]

- The Court should require Plaintiffs to comply with their obligation under the Court's October 31, 2019 Order to produce ESI in native format. They have not done this yet (*e.g.*, some of the ESI they produced was not in native format, and thus, lacks metadata). Notwithstanding the December 18, 2019 discovery deadline, in the event Plaintiffs fail to abide by the October 31, 2019 Order, Love's should be permitted to seek remedies.

- Save for the duty to supplement, document production should be over. In this case's discovery period, stretching over two years and involving many "meet and confer" discussions, Love's has produced 411,000 documents at a cost of at least $250,000 to Love's. These materials include over 380,000 emails from the store-level accounts pertaining to discovery opt-ins. That mountain of data, plus the depositions Plaintiffs have taken, ought to be enough information for them to understand OMs' job duties, which is the only matter at issue in this case.

We explain the rationale for our proposal in more detail below.

**I.      Factual and Procedural Background**

Plaintiffs filed this putative collective action alleging Love's (1) misclassified Operations Managers as exempt from the overtime requirements of the Fair Labor Standards Act ("FLSA") and thus (2) owes Plaintiffs overtime premiums. The chief issue in dispute is whether Plaintiffs had job duties that qualified for an exemption to the FLSA's overtime requirement. The Court conditionally certified a collective on February 16, 2018. During the notice period, which ended on May 25, 2018, 405 individuals filed consent forms and became opt-in Plaintiffs.

   **A.    Discovery Has Been Underway For Over Two Years And The Court Has Extended The Discovery Deadline Numerous Times**

On September 21, 2017, the Court entered a Case Management Order and set a fact discovery deadline of March 15, 2018. (ECF 30). After granting conditional certification, the Court entered a Discovery Management Order on June 25, 2018, setting a new discovery deadline of December 3, 2018 to enable the parties to pursue discovery pertaining to the opt-in Plaintiffs. (ECF 131).

Under the June 25, 2018 Order, Love's was permitted to obtain written discovery from twenty opt-ins and depose five opt-ins (the "discovery opt-ins"). (*Id.*) The discovery opt-ins would be

---

[1] As we explain in Section I.D and I.E., *infra*, but for Plaintiffs' delays, each of these discrete discovery items would have been completed before the December 18, 2019 deadline.

The Honorable Martin C. Carlson
December 9, 2019
Page 3

randomly selected, and in the event an opt-in failed or refused to participate in discovery, that opt-in would be replaced with another randomly-selected opt-in.  (*Id.*)[2]

Since June 25, 2018, there have been *four* extensions of the discovery deadline, each of which was requested to enable the parties to complete ESI productions, written discovery, and depositions.  (*See* 151, 153, 158, 159, 161, 175, 178, 197.)[3]

### B.   Love's Has Spent Hundreds Of Thousands Of Dollars On Discovery

Over the last two years, Plaintiffs have served dozens of interrogatories and over 100 document requests.  On November 8, 2017, Plaintiffs served their first set of 25 interrogatories and 50 document requests.  Love's responded on December 22, 2017, producing approximately 1,400 pages of responsive documents in addition to the documents Love's produced with its Initial Disclosures.  In response to many of Plaintiffs' document requests, Love's stated it would produce responsive email communications after meeting and conferring with Plaintiffs regarding search terms.  (*See, e.g.*, Exh. B.)

On July 26, 2018, Plaintiffs served their second set of 17 interrogatories and 53 document requests, which focused on discovery related to the twenty discovery opt-ins that were randomly selected to participate in discovery under the Court's Discovery Management Order (ECF 131).  Love's served its written responses on October 4, 2018.  Once again, in response to many of Plaintiffs' document requests, Love's stated it would produce responsive email communications after meeting and conferring with Plaintiffs regarding search terms.  (*See, e.g.*, Exh. B.)  In October and November 2018, Love's produced thousands more pages of responsive documents relating to the discovery opt-ins.

As evident from Love's discovery responses, Love's attempted to engage Plaintiffs in discussions regarding ESI issues early on.  Love's has, on several occasions beginning early in discovery, provided information regarding its systems and sources of ESI to Plaintiffs and indicated its willingness to consider Plaintiffs' proposed ESI protocol.[4]  In contrast, for much of 2018 and 2019, Plaintiffs were unwilling to engage in any discussion regarding Plaintiffs' ESI sources, preservation, and collection efforts and refused to run keyword search terms proposed by Love's against Plaintiffs' sources of ESI.  (*See* ECF 169).

As this Court is aware, Love's has undertaken a massive effort, at great cost, regarding its ESI:

---

[2] In light of the Court's Order, the parties followed an opt-in selection process through which the parties and a third party administrator participated in a teleconference, and the third party administrator randomly selected the discovery opt-ins from a list of the total opt-in Plaintiffs.
[3] Plaintiffs' September 9, 2019 request for an extension to December 18, 2019 remains pending.  (*See* ECF 197).
[4] Although Love's stated as early as December 22, 2017 that it was willing to meet and confer with Plaintiffs regarding ESI search terms, Plaintiffs waited nearly one year to submit their proposed ESI protocol to Love's.  Love's received Plaintiffs' proposed ESI protocol on October 12, 2018—only six weeks prior to the close of the first fact discovery deadline in this matter—in what appeared to be a tactic to delay the close of fact discovery.

The Honorable Martin C. Carlson
December 9, 2019
Page 4

- In January 2019, Love's collected, processed, and reviewed the emails of five corporate level custodians specifically identified by Plaintiffs, and searched their emails using Plaintiffs' suggested search terms, with some edits by Love's when Plaintiffs' suggested terms resulted in unusually large results.  This effort resulted in Love's reviewing a collection of 1,641,920 documents.  After processing, filtering, and reviewing the documents, Love's produced 72,684 pages from Plaintiffs' five key custodians and the store-level emails.  After these reviews and productions, Love's wrote Plaintiffs and outlined each of its searches.  Love's retained contract review attorneys to complete this review, which alone cost nearly $64,000, exclusive of Littler's quality control review, processing, and hosting charges.  (*See* ECF 169, p. 9 of 12).

- On May 1, 2019 and September 24, 2019, Love's produced the entire store-level email accounts for seven discovery opt-ins.  Love's did not search these email accounts using keywords, because, contrary to Plaintiffs' insinuation in their November 14, 2019 letter to the Court (ECF 211) that Love's should have used search terms for the store-level emails, Plaintiffs requested these email accounts in full.[5]  In this production, Love's produced over 380,000 documents.[6]

- Love's repeatedly asked, and Plaintiffs' repeated refused, to modify their vastly overbroad search terms.  Indeed, Plaintiffs proposed search terms included, among others, "hours," "budget," "walk," "clean*," and "restroom."  Love's repeatedly told Plaintiffs these terms were overbroad.  In its final iteration, Plaintiffs' search term proposal would have resulted in Love's reviewing nearly 75,000 documents for only two high-level custodians at Love's, Rob Foulke (District Manager for Opt-In Plaintiff Walter McLaws) and Creig Roberts (Divisional Manager for Opt-In Plaintiff Steven Lansaw).  The cost to review documents hit on by Plaintiffs' overbroad search terms would have been approximately $100,000 to Love's.  As such, Love's added a connector to each of Plaintiffs' proposed search terms,

---

[5] Specifically, Plaintiffs' Second Set of Request for Production of Documents, Request No. 3 sought the following:

> Documents, that show, for each pay period during the Material Time, the number of hours worked by Discovery Opt-Ins, including, but not limited to, emails to and from any of the Discovery Opt-Ins, as Operations Managers **or any general email account to which they had access as Operations Managers**, time records, timesheets, work schedules, security logs, alarm logs, and log-in/out records for Defendant's computer systems, such as computer stations, computer software, cash register systems, point of sale systems, email accounts, the earliest and latest time stamped email sent each day, telephone systems, intranet systems, computer-based training systems (including records showing the date and time of completion of such computer-based training), and log-in/out records for Defendant's Wave platform.

(Emphasis added.)

[6] Additionally, Love's searched for and produced any relevant email from Discovery Opt-Ins' individual email accounts.  As Love's has explained to Plaintiffs, most OMs did not have personal email accounts, and, in practice, did not use the accounts even if they did have them.  This was true of the 20 Discovery Opt-Ins, leading to a very small production of email from Discovery Opt-Ins' individual email accounts.

requiring each document to have Plaintiffs' search term as well as the term "OM" or "Operations Manager" in it. This resulted in Love's reviewing 10,559 documents for Roberts and Foulke, which took nearly 250 hours to review at a cost of more than $50,000. Following this review, Love's produced over 6,000 documents from these two custodians.

### C. On September 6, 2019, Love's Stipulated To A Final Extension Of The Discovery Deadline, Identified The Discovery Issues That Remained To Be Resolved, And Implored Plaintiffs To Identify Any Additional Issues By The End Of The Month

When Plaintiffs asked for an extension of the discovery deadline from September 9, 2019 to December 18, 2019, Love's agreed to Plaintiffs' proposal, but made clear it would not agree to any further discovery extension absent "extraordinary circumstances." (*See* ECF 212, Exh. A). Love's further asked Plaintiffs to agree that they would meet and confer in good faith so all of Plaintiffs' outstanding discovery issues with Love's would be resolved by the end of September. To that end, Love's identified the six discovery issues it believed remained to be resolved, including the review of emails for General Managers ("GMs"), District Managers ("DMs"), and Division Directors.[7] Love's further stated:

> *Should you believe that there are additional discovery issues that need to be resolved, please let me know as soon as possible so that we can work to resolve them as quickly as possible.*
>
> *To be clear, we cannot have Plaintiffs continually raising new and additional discovery issues. All of the outstanding discovery issues must be agreed to by the end of September.*

*Id.* (emphasis added).

### D. Plaintiffs Identified No New Discovery Issues Until October 30, 2019, When They Began To Identify A Series Of New Issues, All Of Which They Could Have Raised Months Ago

Instead of taking Love's up on its September 6 offer to identify the universe of outstanding discovery issues, Plaintiffs remained silent for almost seven weeks, until a meet and confer teleconference on October 30, 2019. That teleconference began a series of *ad hoc* discovery problems Plaintiffs raised in the twilight of discovery:

- During the phone conference on October 30, 2019, Plaintiffs stated, for the first time, they could not launch certain training videos produced by Love's on July 31, 2019. (*See* ECF 212, Exh. B). This issue was not encompassed in Love's September 6, 2019 letter delineating the remaining discovery disputes, and Plaintiffs could have raised this issue

---

[7] GMs are the highest level managers in the stores where OMs work. DMs oversee the GMs as well as groups of stores in a particular geographical region, known as districts. Divisional Directors oversee the DMs as well as divisions of the company, which are comprised of approximately 6 to 8 districts each.

earlier because Love's produced the videos months prior. Nevertheless, Love's promised to look into the issue, and it re-produced the training videos on November 22, 2019.

- On October 31, 2019, Plaintiffs raised another new issue. Specifically, Plaintiffs asked Love's to identify by Bates number all materials that Love's produced after the Rule 30(b)(6) depositions in response to a letter Plaintiffs sent on June 19, 2019, and to also advise whether Love's had now provided all materials responsive to Plaintiffs' letter. (*See* ECF 212, Exh. B). Love's again emphasized this was a new issue, but nevertheless responded that Plaintiffs could answer their own question by reviewing the materials Love's produced after the depositions, and that Love's believed it had produced all documents responsive to Plaintiffs' requests. (*See id.*)

- During a November 5, 2019 meet and confer conference, Plaintiffs raised the issue of production of text messages. (*See* ECF 212, Exh. C). This was the *first* time Plaintiffs raised this issue—two years after Love's began producing documents in this case and six weeks before the close of discovery. If Plaintiffs truly were concerned about text messages, they could have raised the issue long ago.

- Then, on November 19, 2019, Plaintiffs issued subpoenas for Mr. Court's and Ms. Warmington's depositions.[8] The timing of these subpoenas is curious. Plaintiffs knew Love's might call Mr. Court and Ms. Warmington as witnesses at least since Love's served its third supplemental Rule 26(a)(1) disclosures on June 14, 2018. Seemingly recognizing the importance of Mr. Court and Ms. Warmington, Plaintiffs subpoenaed both witnesses for documents. In response, on November 16, 2018, Mr. Court and Ms. Warmington produced more than 4,600 pages of documents. Thereafter, Plaintiffs' counsel contacted Mr. Court directly for information about how they searched for responsive documents.

  Knowing this, and with no prior discussions with Love's, Plaintiffs waited until November 19, 2019—one month before the close of discovery—to issue subpoenas for Mr. Court's and Ms. Warmington's depositions. Plaintiffs should not be surprised that, on such short notice, the parties could not find a date between November 19 and December 18 that could accommodate the schedules of the witnesses, Love's in-house counsel, and counsel for the parties. This is particularly true because the parties have been actively scheduling the depositions of opt-in Plaintiffs in December 2019. The impossibility of scheduling Mr. Court's and Ms. Warmington's depositions before the discovery deadline, therefore, is a problem that exists because Plaintiffs waited so long to arrange the depositions of these witnesses.[9]

---

[8] Mr. Court represented Love's in a previous FLSA action regarding the classification of Love's Assistant Manager position (the former title for the Operations Manager position at issue in this lawsuit), and Ms. Warmington was in-house counsel at Love's during that suit.
[9] Only after we pointed these issues out to Plaintiffs, did Plaintiffs agree, on December 6, 2019, to hold Mr. Court's and Ms. Warmington's depositions on January 28, 2020.

The Honorable Martin C. Carlson
December 9, 2019
Page 7

### E.  Plaintiffs Have Failed To Satisfy Their Discovery Obligations

As discussed above, Love's proposes that three additional discrete discovery items occur after the December 18, 2019 deadline.  In addition to (1) holding the Court and Warmington depositions on January 28, 2020, (2) Plaintiffs will respond to Love's written discovery requests to opt-in Plaintiffs Pickel and Townsend by December 19, 2019, and (3) Love's will depose opt-in Plaintiff Kelly McMullen by the end of January 2020.  Plaintiffs' failure to abide by their discovery obligations—not Love's—put the parties in the position of having to complete these tasks after December 18.

*First*, regarding the written discovery Love's served on opt-in Plaintiffs Pickel and Townsend, Plaintiffs' answers and responses are due on December 19, 2019—one day after the discovery deadline.  The only reason Love's served its written discovery on November 19, 2019, and not before that date, is because Love's needed Plaintiffs' cooperation to effect the random selection of those discovery opt-ins, a telephonic process that takes only a few minutes.

Plaintiffs withheld that cooperation.  Love's counsel sent Plaintiffs three emails, between November 13 and November 15, requesting Plaintiffs' participation in the random-selection process.  In the latter email, Love's counsel stated the "random selection must take place on Monday [November 18]."  Plaintiffs refused to participate in the process until Tuesday, November 19.

The parties both knew that Monday, November 18, was the last day Love's could serve discovery on the new opt-in Plaintiffs and give Plaintiffs the full 30 days to respond by the December 18 discovery cut off.  Plaintiffs have at least seven lawyers working on this case; they cannot all have been completely unavailable from November 13 through November 18.  Yet Plaintiffs refused to cooperate in the random-selection process until Tuesday, November 19, when Messrs. Pickel and Townsend were selected randomly.

*Second*, regarding the deposition of opt-in Plaintiff McMullen, Love's is in the position of having to depose Ms. McMullen after December 18, 2019 because it had to move to compel to obtain the documents it needs for her deposition.  Love's could not schedule opt-in depositions until the deponents produced responsive documents.  Love's moved to compel discovery to get those documents on September 4, 2019 (ECF 193), and on October 31, 2019, the Court granted in part and denied in part Love's motion, ordering Plaintiffs to produce all responsive documents to Love's document requests in native format—*i.e.*, with associated metadata.  (ECF 210).

Thereafter, Love's attempted to schedule the remaining four opt-in depositions.  Of necessity, the depositions had to be toward the end of discovery, to give Plaintiffs time to produce all responsive documents required by the October 31 Order.  Three of the four depositions are scheduled for before the December 18 deadline, and Love's intends to take those depositions.  Love's counsel contacted Plaintiffs about scheduling the remaining deposition, Ms. McMullen's, for after December 18 because Love's could not find a date before then that worked for all of the parties involved.

The need to depose this one witness out of time is not Love's fault:  Love's could have deposed Ms. McMullen earlier if Plaintiffs timely produced the documents it needs for her deposition and

the other opt-in depositions—documents Plaintiffs still have not produced in their entirety despite the Court's October 31, 2019 Order. Although Plaintiffs produced some native documents on November 25, 2019, Plaintiffs are still—*39 days after the Court's October 31 Order*—"circling back with the opt-ins to do the additional searches and [determining] whether the native versions of the PDFs previously produced exist." (*See* Exh. C).

Thus, in addition to ending discovery on December 18, 2019 and allowing the parties to complete the three discrete discovery items outlined above after December 18, Love's also respectfully asks the Court to direct Plaintiffs to comply with their obligation under the Court's October 31, 2019 Order to produce ESI in native format. Notwithstanding the December 18, 2019 discovery deadline, in the event Plaintiffs fail to abide by the October 31, 2019 Order, Love's respectfully requests that it be permitted to seek remedies.

**II.   Analysis**

    **A.   The Three Discrete Discovery Items That Must Occur After December 18, 2019 Do Not Justify Yet Another Full-Blown Extension Of Discovery**

A full-blown extension of discovery is not necessary to accomplish the Court and Warmington depositions on January 28, 2020; for opt-in Plaintiffs Pickel and Townsend to respond to Love's written discovery on December 19, 2019; and for Love's to take opt-in Plaintiff McMullen's deposition in late January 2020. As set forth above, Plaintiffs—not Love's—put the parties in the position of having to complete these items after December 18, and each of these tasks can easily be accomplished without an extension of general discovery.

    **B.   The Court Should Reject Plaintiffs' Proposal To Force Love's To Use Plaintiffs' Search Terms To Obtain And Produce ESI From The GMs, DMs, and Divisional Directors Who Supervised The Discovery Opt-Ins**

Plaintiffs request that the Court order Love's to review ESI for *all* GMs, DMs, and Divisional Directors who supervised the 20 discovery opt-in Plaintiffs using Plaintiffs' overbroad search terms, and produce documents that result in "hits." The Court should reject this request because (1) Plaintiffs waited too long to bring the issue to a head and over two year of discovery is enough, *see Brown v. James*, No. 4:CV–03–06, 2009 WL 743321, at *4 (M.D. Pa. Mar. 18, 2009) (denying plaintiff's motion to compel responses to his third set of document requests and denying plaintiff's motion to extend discovery deadlines given the "long period of discovery" that had elapsed); (2) Plaintiffs have yet to identify to which document request such documents are responsive, *see Bowers v. National Collegiate Athletic Ass'n*, 475 F.3d 524, 540 (3d Cir. 2007) (holding that the discovery rules "[do] not require that a party volunteer information that was not encompassed within the scope of an earlier discovery request."); and (3) because Plaintiffs' proposal is not proportional to the needs of this case.

To elaborate on the latter point, Rule 26(b)(1) says that a party may obtain discovery if it is both "relevant to any party's claim or defense *and* proportional to the needs of the case . . . ." (emphasis added). Plaintiffs' proposal for searching emails encompasses the mailboxes of approximately 40 individuals. Plaintiffs propose that Love's run 65 search terms through those 40 mailboxes, review and code those documents, and then produce them. Plaintiffs' proposed

The Honorable Martin C. Carlson
December 9, 2019
Page 9

terms, however, would result in the review of an exorbitant number of documents. For instance, under Plaintiffs' proposal for Mr. Foulke (*see* ECF 212, Exh. D), twenty-five of the search terms would require nearly 1,000 documents or more to be reviewed:

| Search | Count | Family Count | Proposal |
|---|---|---|---|
| Over time OR Overtime OR OT | 1,106 | 2,369 | |
| (Daily OR Weekly) AND Checklist | 491 | 1,367 | |
| Aisle | 1,828 | 3,470 | 50% |
| Back AND Stock | 1,814 | 3,206 | 50% |
| Budget* | 376 | 909 | |
| Clean | 3,605 | 6,591 | 50% |
| Clean* | 1,605 | 2,447 | 50% |
| Complain* | 2,481 | 4,287 | 25% |
| Division AND Recap | 1,009 | 2,223 | 50% |
| Exempt* | 651 | 1,246 | |
| Expect OR Expectation OR Expectations | 3,700 | 5,151 | 20% |
| Hours | 587 | 1,468 | |
| Lawsuit | 972 | 2,156 | |
| Manager AND Flow | 940 | 2,262 | |
| Mclane | 1,552 | 3,496 | 50% |
| No AND Overtime | 998 | 1,754 | |
| Opportunity | 588 | 1,268 | |
| Reclassif* | 812 | 1,636 | |
| Restroom | 632 | 1,334 | |
| Shower | 815 | 1,984 | |
| Survey* | 963 | 2,195 | |
| Task AND List | 756 | 1,779 | |
| Visit* | 1,668 | 2,875 | 50% |
| Wrote w/3 up | 639 | 1,409 | |
| Zone | 680 | 1,429 | |
| **TOTAL** | **31,268** | **60,311** | |

(*See* ECF 212, Exh. D). For just the term "clean" alone, Plaintiffs proposal would have Love's review nearly 3,300 documents. And again, this is just a test for *one* of the 40 mailboxes that Plaintiffs want Love's to search and review.

After Plaintiffs' repeated refusal to revise their search terms, Love's added a connector to each of Plaintiffs' proposed search terms, requiring each document to have Plaintiffs' search term and the term "OM" or "Operations Manager" in it.[10] Even with this revision, Plaintiffs' search terms still

---

[10] As the Court is aware, on October 31, 2019, the parties were ordered to craft ten search terms that Plaintiffs' were to run against *their* ESI. (ECF 210). In negotiations with Plaintiffs' counsel over those search terms, they insisted on using a connector with each search term, explaining that "to ensure [the search terms] are 'carefully tailored,' we'll need to include with each term a connector that targets the 'Love's Universe.'" (*See* ECF 212, Exh. E, p. 3). Plaintiffs further explained that "we need to confine the

The Honorable Martin C. Carlson
December 9, 2019
Page 10

hit on a high number of non-responsive documents. Love's reviewed 10,559 documents for Foulke and Roberts. A little more than half of these documents were responsive, meaning that half were not responsive. This is remarkably unresponsive, especially when considering that each of the search terms included both the term "OM" and "operations manager."

Plaintiffs' overbroad search terms caused Love's to spend a fair amount of money reviewing non-responsive documents. Love's estimates that the review of another 40 custodians' email would cost between $1 - $2 million. Such an extraordinary expense is not proportional to the needs of the case, particularly when Love's has already spent more than $250,000 reviewing and producing documents. Further, there is no reason to believe that emails between managers above the store level will provide better or further insight into OMs' job duties than the insights that can be gained from reviewing the seven store-level emails Love's already produced to Plaintiffs, as well as the emails from other high level managers.

### C. The Court Must Reject Plaintiffs' Attempt To Contrive, In The Twilight Of Discovery, A Dispute About Text Messages

When Love's sent Plaintiffs the September 6, 2019 letter, Plaintiffs were already in receipt of the overwhelming majority of documents Love's produced. As of September 6, 2019, Plaintiffs had never protested Love's alleged failure to produce text messages. And, Plaintiffs did not that issue in September, as requested by Love's. Instead, Plaintiffs first raised that issue on November 5. The Court should reject Plaintiff attempt to inject this issue into controversy now, for four reasons:

*First*, Plaintiffs should not be allowed to prolong discovery by requesting text messages in the twilight of discovery, after this case has been pending for over two years. *See, e.g., Newkirk v. ConAgra Foods*, Civ. A. No. 10–cv–22–LSC–FG3, 2010 WL 2135263, at *6 (D. Neb. May 27, 2010) (granting motion to quash subpoena because plaintiffs had ample opportunity over nearly two years to obtain the discovery sought and had received over 10,000 pages of discovery already); *In re Zyprexa*, Civ. A. No. 04-1596, 2009 WL 1310890, at *3 (E.D.N.Y. May 8, 2009) (denying plaintiff's motion to compel production responsive to additional document requests served near the close of fact discovery); *Maldonado v. Invensys*, Civ. A. No. 01-50433, 2004 WL 1080191, at *1 (N.D. Ill. May 13, 2004) (denying plaintiff's request for additional productions "in the twilight" of fact discovery); *Brown*, 2009 WL 743321, at *4 (denying plaintiff's motion to compel responses to his third set of document requests and denying plaintiff's motion to extend discovery deadlines given the "long period of discovery" that had elapsed).

*Second*, Plaintiffs simply have made a blanket request for text messages without identifying to which document requests text messages would be responsive. *See Bowers v*, 475 F.3d at 540

---

search of Plaintiffs' e-mails to the Love's Universe of documents to avoid unnecessary burden, expense, and review of thousands of documents that bear absolutely no relationship to Love's or this matter." This is precisely why Love's added connectors to each of Plaintiffs' proposed search terms for *Love's* ESI: to avoid unnecessary burden, expense, and review of thousands of documents that bear absolutely no relationship to this matter.

(holding that the discovery rules "[do] not require that a party volunteer information that was not encompassed within the scope of an earlier discovery request.").

*Third*, under Rule 34, a party need only produce documents that are in its "possession, custody, or control." In the Third Circuit, "possession custody or control" means that a party has a "legal right" to obtain the responsive documents. *See, e.g., Brewer v. Quaker State Oil Ref. Co.*, 72 F.3d 326, 334 (3d Cir. 1995). Love's does not have possession, custody or control over the vast majority of the mobile devices of the GMs, DMs and Division Directors. None of the over 500 GMs have company-issued devices. Accordingly, if they are sending or receiving text messages, they are doing so on their own personal devices and Love's does not have possession, custody, or control over them. Of Love's 200 plus DMs and Divisional Directors, about half are using personal devices, meaning that Love's does not have possession, custody, or control over them.

*Fourth*, as to the 100 or so DMs and Division Directors who have Love's-issued mobile devices, the cost to obtain these devices are not proportional to the needs of the case. The cost to forensically collect and extract text messages from a *single* mobile device costs approximately $1,500 *per device*. Accordingly, it would cost Love's at least $150,000 just to collect and extract text messages. This cost dos not include the time and expense associated with reviewing and producing text messages, which would costs tens, if not hundreds of thousands of dollars. It would also take months to complete the collection process as the mobile devices are spread across dozens of states.

### D. More Than Two Years Of Discovery Is Enough

We are in the twilight of a prolonged discovery period in which Love's produced voluminous materials and spent vast sums of money doing so. The Court should not allow Plaintiffs to extend a tortuous discovery process even further by (1) deciding to ignore our September 6, 2019 letter and sporadically raising several issues for the first time in the twilight of discovery and (2) failing to meet their discovery obligations.

### III. Conclusion

Two years of discovery is enough. Plaintiffs have ample evidence regarding their job duties, and the efforts of the parties and the Court would be better directed toward dispositive motions and an examination of whether Plaintiffs can prove liability for 405 people on common evidence. Save for the three discrete issues above, the Court should adhere to its discovery deadline of December 18, 2019 and set deadlines of March 2, 2020 for certification and decertification motions and April 12, 2020 for dispositive motions.

Respectfully submitted,

/s/ Matthew J. Hank

Matthew J. Hank, Esq.
Donald W. Myers, Esq.
Rachel Fendell Satinsky, Esq.