IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KRISTOPHER LAWSON, et al.,** | : | Civil No. 1:17-CV-1266 |
| | : | |
| Plaintiffs, | : | **(Chief Judge Conner)** |
| | : | |
| v. | : | |
| | : | **(Magistrate Judge Carlson)** |
| **LOVE'S TRAVEL STOPS &** | : | |
| **COUNTRY STORES, INC.,** | : | |
| | : | |
| Defendant. | : | |

# MEMORANDUM AND ORDER

## I. Factual and Procedural Background

Advancements in technology now enable us to collect, retain, analyze and review electronically stored information (ESI) on a scale which was unimaginable a generation ago. These technological advances, however, create a challenge for parties who become engaged in litigation: How do parties conduct civil discovery and assess questions of relevance and privilege when presented with the staggering volume of ESI which many large organizations routinely collect and retain?

To meet this challenge, the Sedona Conference has developed a series of guiding tenets, the Sedona Principles, which describe best practices in this field. See the Sedona Conference, The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production A Project of the Sedona Conference Working Group on Electronic Document

1

Retention and Production, 19 Sedona Conf. J. 1 (2018). The Sedona Principles embrace 14 specific tenets,[1] marked by several overarching guiding concepts. First,

---

[1] **1.** Electronically stored information is generally subject to the same preservation and discovery requirements as other relevant information.
**2.** When balancing the cost, burden, and need for electronically stored information, courts and parties should apply the proportionality standard embodied in Fed. R. Civ. P. 26(b)(1) and its state equivalents, which requires consideration of the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.
**3.** As soon as practicable, parties should confer and seek to reach agreement regarding the preservation and production of electronically stored information.
**4.** Discovery requests for electronically stored information should be as specific as possible; responses and objections to discovery should disclose the scope and limits of the production.
**5.** The obligation to preserve electronically stored information requires reasonable and good faith efforts to retain information that is expected to be relevant to claims or defenses in reasonably anticipated or pending litigation. However, it is unreasonable to expect parties to take every conceivable step or disproportionate steps to preserve each instance of relevant electronically stored information.
**6.** Responding parties are best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own electronically stored information.
**7.** The requesting party has the burden on a motion to compel to show that the responding party's steps to preserve and produce relevant electronically stored information were inadequate.
**8.** The primary sources of electronically stored information to be preserved and produced should be those readily accessible in the ordinary course. Only when electronically stored information is not available through such primary sources should parties move down a continuum of less accessible sources until the information requested to be preserved or produced is no longer proportional.
**9.** Absent a showing of special need and relevance, a responding party should not be required to preserve, review, or produce deleted, shadowed, fragmented, or residual electronically stored information.

the Sedona Principles recognize that the technological advances that enable us to store countless pieces of data electronically do not alter the legal obligations of parties in discovery. Therefore, parties must still follow the principles embodied in Federal Rules of Civil Procedure when preserving, collecting, evaluating, and disclosing ESI. Id. Principles 1, 2. However, the sheer volume of this data imposes special duties and obligations on litigants. Foremost among these obligations is a duty to work in a cooperative and collaborative fashion to devise discovery strategies which allow of the transparent disclosure of relevant evidence that is not cloaked in any claim of privilege. Indeed, the Sedona Principles' injunction that parties should

---

**10.** Parties should take reasonable steps to safeguard electronically stored information, the disclosure or dissemination of which is subject to privileges, work product protections, privacy obligations, or other legally enforceable restrictions.
**11.** A responding party may satisfy its good faith obligations to preserve and produce relevant electronically stored information by using technology and processes, such as sampling, searching, or the use of selection criteria.
**12.** The production of electronically stored information should be made in the form or forms in which it is ordinarily maintained or that is reasonably usable given the nature of the electronically stored information and the proportional needs of the case.
**13.** The costs of preserving and producing relevant and proportionate electronically stored information ordinarily should be borne by the responding party.
**14.** The breach of a duty to preserve electronically stored information may be addressed by remedial measures, sanctions, or both: remedial measures are appropriate to cure prejudice; sanctions are appropriate only if a party acted with intent to deprive another party of the use of relevant electronically stored information. The Sedona Conference, The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production A Project of the Sedona Conference Working Group on Electronic Document Retention and Production, 19 Sedona Conf. J. 1, 51–53 (2018)

collaborate in conducting electronic discovery underscores that cooperation is the keystone to any successful ESI discovery strategy. Id. Principles 3-12.

The Sedona Principles then identify two specific, collaborative strategies which, when employed by litigants, enhance the fairness and transparency of voluminous ESI discovery review: The use of relevant search terms or technology assisted review to cull ESI and on-going sampling of data to assess the accuracy of search term searches. Id. at 164-67. This process, however, places reciprocal responsibilities on all litigants. First, for requesting parties, it is clear that discovery requests for electronically stored information should be as specific as possible. This duty of specificity applies to the formulation of search terms to be used in ESI searches. These search terms should be tailored to the needs of the case and designed to capture that which is relevant without burdening parties with excessive, irrelevant data. For responding parties, there is a corresponding duty to ensure the accuracy of searches by cooperating in sampling techniques that allow the parties to revise their searches to locate that which is relevant, protect that which is privileged, and exclude that which does not pertain to the parties' dispute.

When litigants depart from these Sedona Principles, ESI discovery can often devolve into a dysfunctional process, one which produces more heat and smoke than light. When this occurs, the court must intervene and prescribe cooperative practices for parties that are unable to collaborate on their own. There is a peril to this course,

which thrusts responsibility for devising elements of an ESI discovery strategy upon the court. As one judge has observed: "Given this complexity, for . . . judges to dare opine that a certain search term or terms would be more likely to produce information than the terms that were used is truly to go where angels fear to tread." United States v. O'Keefe, 537 F. Supp. 2d 14, 24 (D.D.C. 2008). Nonetheless, in this case we are called upon to perform this task for the parties who are now engaged in an intractable series of ESI discovery disputes.

This case is a Fair Labor Standards Act (FLSA) collective action brought on behalf of current and former Operations Managers (OMs) employed at various Love's Travel Stops. (Doc. 1). The plaintiffs allege that they were misclassified as exempt managerial employees under the FLSA, 29 U.S.C. § 201, *et seq.*, and accordingly were not paid overtime as required by federal law. (Id.) On February 16, 2018, the court entered an order conditionally granting the plaintiffs' motion for class and collective certification in this case. (Doc. 68). Following the entry of this order, approximately 400 current and former Love's OMs opted into this conditionally certified class and the parties engaged in a course of reciprocal discovery involving the defendants and a selected group of discovery Opt-in plaintiffs. In connection with this reciprocal discovery, the plaintiffs propounded discovery which sought to review ESI, including emails of various General Managers (GMs), District Managers (DMs) and Division Directors who oversaw the

work of these Operations Managers. These emails had an obvious potential relevance to this FLSA misclassification claim, since OM job duty discussions by these officials and the directions that these supervisors provided to the OMs could shed light on whether the OM duties were truly supervisory and subject to an FLSA exemption or were more akin to those of salaried employees entitled to the protections of the FLSA.

With the potential relevance of this information thus defined, the parties have engaged in what we regard as a dysfunctional ESI discovery process. While each party blames the other for the sorry state of this discovery process, in our view, all parties share some responsibility for the current sad state of this discovery. At the outset, we question whether the plaintiffs' proposed list of 65 search terms fully met the Sedona Principles' injunction that discovery requests for electronically stored information should be as specific as possible. For example, the use of search terms like "clean", "complain", "expect", or "salar*" are so broad that they may well capture much which is not relevant and exponentially increase the costs and burdens of discovery. While Love's decries the use of this expansive list of search terms as a burdensome departure from the Sedona Principles, Love's itself is alleged to have also failed to abide by these principles. Specifically, the plaintiffs allege that when initial hit reports of these search terms were run by Love's, the defense then refused

to engage in the form of sampling that the Sedona Conference has deemed to be essential to informed modification and refinement of search terms.

Thus, the conduct of this aspect of ESI discovery was marked by mutual departures from the best practices enshrined in the Sedona Principles. The plaintiffs had not narrowly crafted their search terms and the defendant had declined to allow transparent sampling to refine further word searches. Even at this juncture, however, adherence to the overarching Sedona guidance that parties work together in a cooperative and collaborative fashion might have enabled the parties to overcome these early missteps and devise a mutually agreeable ESI protocol without the court's intervention.

Unfortunately, despite our encouragement, the parties did not choose this collaborative direction. Instead, each party followed its own unilateral course, choosing separate paths that lead to the current ESI discovery impasse. For its part, Love's chose on its own to add modifiers to the plaintiffs' search terms, adding "OM" or "Operations Manager" to the plaintiffs' proposed search terms. While these modifiers significantly narrowed the scope of responsive documents, as the plaintiffs have pointed out, the use of these modifiers may be unduly restrictive and, in the absence of some rational mutual sampling process, it is impossible to reliably determine what the universe of potentially relevant, but unidentified, records may be.

Stymied by the defendant's refusal to engage in sampling of data, the plaintiffs have advanced their own unilateral approach to ESI discovery, recommending that we order the wholesale disclosure of specific percentages of the various records identified by the defense based upon the plaintiffs' initial 65-word search parameters. While this approach may avoid the evil that the plaintiffs identified in Love's narrow search—the fact that the narrow modifiers used by Love's may not capture other relevant ESI—this proposal, which is not informed by any data sampling, runs the risk of being vastly over-inclusive, imposing undue expense and burdens upon Love's.

Presented with this binary choice by the parties, a binary choice driven by the failure to abide by Sedona Principles, for the reasons set forth below, we will choose a third path for the parties, one which compels cooperation and scientific sampling to achieve fair ESI discovery outcomes.[2]

## II. <u>Discussion</u>

### A. <u>Guiding Principles.</u>

Rulings regarding the proper scope of discovery are matters consigned to the court's discretion and judgment. A court's decisions regarding the conduct of discovery will be disturbed only upon a showing of abuse of that discretion.

---

[2] We recognize that that parties are also embroiled in other discovery disputes regarding cell phone discovery, and employee personnel files. We will address these dispute in a separate memorandum opinion.

Marroquin-Manriquez v. I.N.S., 699 F.2d 129, 134 (3d Cir. 1983). This far-reaching discretion also extends to rulings by United States Magistrate Judges on discovery matters. In this regard:

> District courts provide magistrate judges with particularly broad discretion in resolving discovery disputes. See Farmers & Merchs. Nat'l Bank v. San Clemente Fin. Group Sec., Inc., 174 F.R.D. 572, 585 (D.N.J. 1997). When a magistrate judge's decision involves a discretionary [discovery] matter . . ., "courts in this district have determined that the clearly erroneous standard implicitly becomes an abuse of discretion standard." Saldi v. Paul Revere Life Ins. Co., 224 F.R.D. 169, 174 (E.D. Pa. 2004) (citing Scott Paper Co. v. United States, 943 F. Supp. 501, 502 (E.D. Pa. 1996)). Under the standard, a magistrate judge's discovery ruling "is entitled to great deference and is reversible only for abuse of discretion." Kresefky v. Panasonic Commc'ns and Sys. Co., 169 F.R.D. 54, 64 (D.N.J. 1996); see also Hasbrouck v. BankAmerica Hous. Servs., 190 F.R.D. 42, 44-45 (N.D.N.Y. 1999) (holding that discovery rulings are reviewed under abuse of discretion standard rather than de novo standard); EEOC v. Mr. Gold, Inc., 223 F.R.D. 100, 102 (E.D.N.Y. 2004) (holding that a magistrate judge's resolution of discovery disputes deserves substantial deference and should be reversed only if there is an abuse of discretion).

Halsey v. Pfeiffer, No. 09-1138, 2010 WL 2735702, at *1 (D.N.J. Sept. 27, 2010).

The exercise of this discretion is guided, however, by certain basic principles. At the outset, Rule 26(b) of the Federal Rules of Civil Procedure generally defines the scope of discovery permitted in a civil action, prescribes certain limits to that discovery and provides as follows:

(b) Discovery Scope and Limits.

(1) *Scope in General*. Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's

> claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1).

Thus, our discretion is limited in a number of significant ways by the scope of Rule 26 itself, which provides for discovery of only "nonprivileged matter that is relevant to any party's claim or defense." Therefore, "[t]he Court's discretion in ruling on discovery issues is, therefore, restricted to valid claims of relevance and privilege." Robinson v. Folino, No. 14-227, 2016 WL 4678340, at *2 (citing Jackson v. Beard, No. 11-1431, 2014 WL 3868228, at *5 (M.D. Pa. Aug. 6, 2014) ("[a]lthough the scope of relevance in discovery is far broader than that allowed for evidentiary purposes, it is not without its limits....Courts will not permit discovery where a request is made in bad faith, unduly burdensome, irrelevant to the general subject matter of the action, or relates to confidential or privileged information")).

Accordingly, at the outset, it is clear that Rule 26's definition of that which can be obtained through discovery reaches nonprivileged matter that is relevant to any party's claim or defense, and valid claims of relevance and privilege still cabin and restrict the court's discretion in ruling on discovery issues. Furthermore, the scope of discovery permitted by Rule 26 embraces all relevant information, a

concept which is not confined to admissible evidence but is also defined in the following terms: "Information within this scope of discovery need not be admissible in evidence to be discoverable." Rather, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." This concept of relevance is tempered, however, by principles of proportionality. Thus, we are now enjoined to also consider whether the specific discovery sought is "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). "Thus, it has been said that the amended rule 'restores the proportionality factors to their original place in defining the scope of discovery.'" Fassett v. Sears Holdings Corp., 319 F.R.D. 143, 150 (M.D. Pa. 2017) (quoting Wertz v. GEA Heat Exchangers Inc., No. 1:14-CV-1991, 2015 WL 8959408, at *2 (M.D. Pa. Dec. 16, 2015)).

In terms of the current ESI discovery dispute that divides these parties, we are reminded that the failure to engage in a collaborative search and sampling strategy can often yield discovery dysfunction. As one court has observed when addressing a similar discovery dispute:

> While keyword searches have long been recognized as appropriate and helpful for ESI search and retrieval, there are well-know[n] limitations

and risks associated with them, and proper selection and implementation obviously involves technical, if not scientific knowledge.

\* \* \*

Selection of the appropriate search and information retrieval technique requires careful advance planning by persons qualified to design effective search methodology. The implementation of the methodology selected should be tested for quality assurance; and the party selecting the methodology must be prepared to explain the rationale for the method chosen to the court, demonstrate that it is appropriate for the task, and show that it was properly implemented.

Victor Stanley, Inc. v. Creative Pipe, Inc., 250 F.R.D. 251, 260, 262 (D.Md. May 29, 2008) (Grimm, M.J.).

[One court] has taken the warning even further:

> Whether search terms or "keywords" will yield the information sought is a complicated question involving the interplay, at least, of the sciences of computer technology, statistics and linguistics. Given this complexity, for lawyers and judges to dare opine that a certain search term or terms would be more likely to produce information than the terms that were used is truly to go where angels fear to tread. This topic is clearly beyond the ken of a layman and requires that any such conclusion be based on evidence that, for example, meets the criteria of Rule 702 of the Federal Rules of Evidence.

United States v. O'Keefe, 537 F.Supp.2d 14, 24 (D.D.C.2008) (Facciola, M.J.); accord, Equity Analytics, LLC v. Lundin, 248 F.R.D. 331, 333 (D.D.C.2008) (Facciola, M.J.); see also, e.g., In re Seroquel Products Liability Litig., 244 F.R.D. 650, 662 (M.D.Fla.2007) (Baker, M.J.) ("[W]hile key word searching is a recognized method to winnow relevant documents from large repositories, use of this technique must be a cooperative and informed process.... Common sense dictates that sampling and other quality assurance techniques must be employed to meet requirements of completeness."); Jay Grenig, Browning Marean

> & Mary Pat Poteet, Electronic Discovery & Records Management Guide: Rules, Checklists & Forms (2009 ed.), § 15:15 ("[K]eyword searches do not reflect context. They can also miss documents containing a word that has the same meaning as the term used in the query but is not specified. Misspelled words may be missed in a keyword search.").
>
> Of course, the best solution in the entire area of electronic discovery is cooperation among counsel. This Court strongly endorses The Sedona Conference Cooperation Proclamation.
>
> * * *
>
> Electronic discovery requires cooperation between opposing counsel and transparency in all aspects of preservation and production of ESI. Moreover, where counsel are using keyword searches for retrieval of ESI, they at a minimum must carefully craft the appropriate keywords, with input from the ESI's custodians as to the words and abbreviations they use, and the proposed methodology must be quality control tested to assure accuracy in retrieval and elimination of "false positives." It is time that the Bar—even those lawyers who did not come of age in the computer era—understand this.

William A. Gross Const. Assocs., Inc. v. Am. Mfrs. Mut. Ins. Co., 256 F.R.D. 134, 135–36 (S.D.N.Y. 2009) (footnotes omitted).

However, in the absence of any informed accord by the parties, we will now devise an ESI protocol to guide the parties moving forward.

### B. **The Court's ESI Protocol for GM, DM and Division Director Emails**

As we have noted, the approach taken by the parties to ESI discovery in our view was flawed in three respects: First, it lacked the collaborative quality expected of litigants. Second, it relied upon what may have been an overly broad word search

list initially proffered by the plaintiffs. Finally, the defendant's refusal to engage in search sampling left all parties essentially blind and unable to make informed choices regarding modification of search criteria. The parties' decision to pursue two different and unilateral approaches to resolve this discovery dispute then compounded rather than eliminated these discovery shortcomings.

While submitting this dispute to the court to resolve "is truly to go where angels fear to tread." O'Keefe, 537 F.Supp.2d at 24, presented with this degree of dysfunction, we will attempt to bring the parties back to the Sedona Principles in the following fashion:

The defendant shall immediately disclose to the plaintiffs the results of its narrower word search, which used the plaintiffs' search terms with the modifiers "OM" or "Operations Manager." However, in order to address the plaintiffs' legitimate concern that we are currently unable to determine whether this search has been unduly restrictive, the parties will engage in the following additional discovery in accordance with the Sedona Principles:

First, the plaintiffs will propose a narrow set of search terms to the defendant, limiting those search terms to the 25 most relevant terms identified by the plaintiffs through the initial hit reports provided by the defense.

Second, the defendant will use these modified search terms to identify a more narrowly-focused body of data.

Third, the parties will then select a statistically valid random sample of these records for mutual inspection.

Fourth, if that sampling inspection suggests the need for further narrowing modification of these search terms, the parties will employ agreed-upon modifiers to narrow the scope of this search.

At the conclusion of this process, the parties will consult and confer regarding the disclosure of the additional records identified through this collaborative iterative process, and will either disclose those records, or submit a joint status report with the parties competing recommendations to the court by **February 17, 2019.**

We regret that the parties have been unable to resolve this dispute in accordance with the Sedona Principles, and have thus been compelled to turn to the court to address this matter. In our view, the approach we have fashioned is appropriate because it reconciles the competing concerns of the parties and requires adherence to the fundamental concepts that guide ESI discovery. Therefore, the parties shall follow this procedure unless they *jointly* agree upon an alternative approach to this ESI discovery that they wish to present to the court for its approval.

An appropriate order follows.

DATED: December 23, 2019

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KRISTOPHER LAWSON, et al.,** | : | **Civil No. 1:17-CV-1266** |
| | : | |
| **Plaintiffs,** | : | **(Chief Judge Conner)** |
| | : | |
| v. | : | |
| | : | **(Magistrate Judge Carlson)** |
| **LOVE'S TRAVEL STOPS &** | : | |
| **COUNTRY STORES, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

## ORDER

AND NOW, this 23d day of December 2019, in accordance with the accompanying Memorandum, with respect to the parties' dispute regarding ESI protocols for searching GM, DM and Division Director emails, IT IS ORDERED as follows:

The defendant shall immediately disclose to the plaintiffs the results of its narrower word search which used the plaintiffs' search terms with the modifiers "OM" or "Operations Manager." However, in order to address the Plaintiffs' legitimate concern that we are currently unable to determine whether this search has been unduly restrictive, the parties will engage in the following additional discovery in accordance with the Sedona principles:

First, the plaintiffs will propose a narrow set of search terms to the defendant, limiting those search terms to the 25 most relevant terms identified by the plaintiffs through the initial hit reports provided by the defense.

Second, the defendant will use these modified search terms to identify a more narrowly focused body of data.

Third, the parties will then select a statistically valid random sample of these records for mutual inspection.

Fourth, if that sampling inspection suggests the need for further narrowing modification of these search terms, the parties will employ agreed-upon modifiers to narrow the scope of this search.

At the conclusion of this process, the parties will consult and confer regarding the disclosure of the additional records identified through this collaborative iterative process, and will either disclose those records, or submit a joint status report with the parties competing recommendations to the court by **February 17, 2020.**

*/s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge