# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KRISTOPHER LAWSON, et al.,** | : | **Civil No. 1:17-CV-1266** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **LOVE'S TRAVEL STOPS &** | : | |
| **COUNTRY STORES, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM AND ORDER

### I.  Factual and Procedural Background

On July 18, 2017, the plaintiffs filed this Fair Labor Standards Act (FLSA) collective action brought on behalf of current and former Operations Managers (OMs) employed at various Love's Travel Stops. (Doc. 1). The plaintiffs alleged in their complaint that the OMs were misclassified as exempt managerial employees under the FLSA, 29 U.S.C. § 201, *et seq.*, and accordingly were not paid overtime as required by federal law. (Id.)

The factual allegations in this complaint were potentially far-reaching and significant for all parties. Moreover, several factors unique to this case took this lawsuit beyond the garden variety of FLSA claims into a much more complex realm. For example, in the course of this litigation the parties contested significant and

1

complicated discovery issues relating to a host of matters. As a result, the parties engaged in intensive discovery practice spanning several years in order to thoroughly investigate these FLSA allegations. Likewise, the lawsuit involved significant logistical challenges for all parties, including challenges relating to the marshalling of evidence and coordination of claims and defenses in a multi-party collective action. Finally, the lawsuit involved a class of workers, Operations Managers, whose purported duties created particular challenges in FLSA litigation.

Over the past several years we have worked closely with counsel addressing these issues. In the course of overseeing this litigation, we have been struck by the singular complexity of the lawsuit and the high level of skill, sophistication, talent and tenacity displayed by all counsel. Simply put, this case presented litigative obstacles of the highest order, which were addressed by all counsel in an exceptionally skilled manner.

Following an intensive course of pre-trial litigation, the parties commenced settlement negotiations in 2020. (Docs. 267-273). The parties then conducted protracted and intense settlement discussions with the occasional assistance of the court. (Id.) Those arms-length negotiations culminated with the parties' agreement on the terms of a proposed collective settlement. The parties then consented to magistrate judge jurisdiction, (Doc. 274), and submitted their proposed settlement agreement to the court for its approval, as required by the FLSA. (Doc. 273).

That agreement is embodied in a 66-page document consisting of the proposed agreement and attachments. In pertinent part, the agreement provides for the creation of a total settlement fund of $2,950,000. (Doc. 273-3, § 1.11). From this sum, $1,500,000 is set aside as a collective member fund for payment to the participating individual collective plaintiffs. (Id.) A portion of this $1,500,000 sum totaling $37,500 is designated as service payment allocations for six lead plaintiffs whose role in the litigation warrants service award payments. (Id.) The agreement then calls for the payment of $137,195.83 in litigation expenses incurred by plaintiffs' counsel from the settlement fund. (Id.) Finally, under the terms of the agreement, plaintiffs' counsel, who have taken the lead over the past four years in pursuing this highly complex and difficult FLSA action, are to receive attorneys' fees of up to $1,312,804.17. (Id.) According to affidavits submitted in support of this motion seeking approval of the settlement agreement, this negotiated attorneys' fee award constituted a significant reduction below the actual fees incurred in the prosecution of this case, fees which would have otherwise potentially exceeded $2,270,000. (Doc. 273-2, at 9-10; Doc. 273-5, at 6).

Contingent upon court approval, the agreement then provides for a comprehensive notice process to FLSA collective members and prescribes a procedure for the allocation of payments from the $1,500,000 fund among participating collective members. (Id., §§ 3.1-3.2). The settlement agreement further

defines the defendant's payment obligations (Id., §§ 4.1-4.9);  the release of claims by named plaintiffs and FLSA collective members (Id. §§ 5.1-5.3); reaffirms the parties counsel's authority to act (Id., §§ 6.1-6.4); and contains final provisions pledging mutual cooperation in the execution of this agreement, as well as prescribing rules for the interpretation of the agreement. (Id., §§ 7.1-7.8)

Upon consideration of the agreement, and the parties' supplemental submissions, this settlement is approved as a fair, reasonable, and adequate resolution of this complex and protracted FLSA collective action.

## II. Discussion

It is axiomatic that courts favor the settlement of disputed claims. In the context of litigation under the Fair Labor Standards Act, as a general rule, "[t]here are only two ways that FLSA claims may be compromised or settled: (1) a compromise supervised by the Department of Labor pursuant to 29 U.S.C. § 216(c), or (2) a compromise approved by the district court pursuant to 29 U.S.C. § 216(b)." Kraus v. PA Fit II, LLC, 155 F. Supp. 3d 516, 522 (E.D. Pa. 2016). In conducting its review of a proposed FLSA settlement, the court should determine whether the agreement constitutes a resolution of a bona fide workplace dispute. The court "next conducts a two-part fairness inquiry to ensure that (1) the settlement is fair and reasonable for the employees, and (2) the settlement furthers the FLSA's

4

implementation in the workplace." Altnor v. Preferred Freezer Servs., Inc., 197 F. Supp. 3d 746, 764 (E.D. Pa. 2016) (citations omitted).

Moreover, "[i]n this Circuit, a settlement is entitled to an initial presumption of fairness where it resulted from arm's-length negotiations between experienced counsel . . . ." Galt v. Eagleville Hosp., 310 F. Supp. 3d 483, 493 (E.D. Pa. 2018). However, in evaluating whether that presumption applies, we are enjoined to consider a multi-factor test that examines the sufficiency of the settlement terms, the costs, risks, and complexity of the litigation, elements of litigative risk, as well as the enforceability of any judgments that might be obtained through protracted litigation. Id. (citing Girsh v. Jepson, 521 F.2d 153 (3d Cir. 1975)). Specifically, we are enjoined to consider the following factors when assessing the fairness of a proposed settlement:

> (1) the complexity, expense and likely duration of the litigation . . . ; (2) the reaction of the class to the settlement . . . ; (3) the stage of the proceedings and the amount of discovery completed . . . ; (4) the risks of establishing liability . . . ; (5) the risks of establishing damages . . . ; (6) the risks of maintaining the class action through the trial . . . ; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . . ; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975).

Guided by these principles, we find that the proposed settlement in this case is fair, reasonable, and adequate. In reaching this conclusion, we note at the outset

that the proposed agreement resolves what is plainly a bona fide workplace dispute. Indeed, the issues presented in this lawsuit concerning alleged misclassification of employees and entitlement to overtime pay lie at the heart of the protections afforded to workers by the FLSA. We further conclude "that (1) the settlement is fair and reasonable for the employees, and (2) the settlement furthers the FLSA's implementation in the workplace." Altnor, 197 F. Supp. 3d at 764.

This finding is based upon our own independent assessment of the factors prescribed by the Third Circuit in Girsh. At the outset, we find that the complexity, expense, and likely duration of this litigation strongly favor settlement of this lawsuit. To date, the parties have engaged in nearly four years of preliminary, but vitally important, discovery litigation. This discovery litigation has highlighted both the expense and complexity of this case, as the parties have presented the court with numerous complicated discovery disputes, many of which have underscored the expensive nature of this collective FLSA litigation. Further, absent a settlement, and with the past as a predictor of the future, we anticipate that merits litigation moving forward would also be both highly expensive and extensive in its scope and duration.

As for the collective member's reaction to the litigation, at this post-certification stage where numerous collective members have opted into this litigation, it is evident that the lawsuit, and hence its successful settlement, appear to

enjoy broad support. This consideration also augurs in favor of approval of the settlement.

The third Girsh factor, the stage of these proceedings, also weighs heavily in favor of approval of this settlement. In this case, the parties have engaged in arms-length negotiations of this dispute following an intense, protracted, and extensive course of discovery. This discovery has enabled all parties to engage in their settlement negotiations in a fully informed fashion, weighing the risks and rewards of litigation based upon a complete understanding of the complex factual backdrop to this lawsuit. Indeed, where, as here,  parties have "conducted extensive discovery and fully briefed several motions, demonstrating an appreciation of the merits and risks of proceeding to trial before negotiating the settlement agreement," courts have often approved FLSA settlements as well-informed choices by the litigants. Dino v. Pennsylvania, No. 1:08-CV-01493, 2013 WL 4041681, at *4 (M.D. Pa. Aug. 8, 2013).

Girsh and it progeny also caution us to consider litigative risk in evaluating the reasonableness of an FLSA collective action settlement, specifically enjoining us to take into account "the risks of establishing liability; [] the risks of establishing damages; [and] the risks of maintaining the class action through the trial." Girsh, 521 F.2d at 157. While such predictive judgments are often difficult to make with any certainty, suffice it to say that the plaintiffs' claim that Operations Managers,

7

who were purportedly on-site store managers, fell within the ambit of the FLSA could have faced significant legal and factual challenges at trial. Thus, compromise and settlement of this claim was a prudent course on behalf of all parties.

Further, when we consider the final <u>Girsh</u> factors, the range of reasonableness of the settlement fund in light of possible recoveries and risks of litigation, we are fully satisfied that this settlement is a very fair and reasonable outcome for all parties. The parties estimate that this settlement may yield an average recovery for FLSA collective members of $3,627.05. According to the plaintiffs' counsel, this average rate of recovery compares favorably to other FLSA settlements that have been approved by the courts, underscoring the reasonableness and fairness of this particular outcome.[1] Indeed, this court has expressly approved FLSA settlement as fair and reasonable which have yielded lower average payments to collective members. <u>Creed v. Benco Dental Supply Co.</u>, No. 3:12-CV-01571, 2013 WL 5276109, at *1 (M.D. Pa. Sept. 17, 2013) (approving gross average recovery of approximately $2,500 per class member, which will amount to approximately

---

[1] <u>See, e.g.</u>, <u>Ogaian v. Christmas Tree Shops</u>, 12 Civ. 1273 (S.D.N.Y.) (recovering approximately $3,284 per participant); <u>Ferreira v. Modell's Sporting Goods, Inc</u>., 11Civ. 2395 (S.D.N.Y.) (recovering approximately $1,161 per participant); <u>Hegab v. Family Dollar Stores Inc</u>., 11 Civ. 01206 (D.N.J.) (recovering approximately $2,064 per participant, a result the court noted weighed "overwhelmingly weigh[ed] in favor of approval"); <u>Nash v. CVS Caremark Corp</u>., 9 Civ. 79 (D.R.I.) (recovering $1,760 per participant, a result the court termed "magnificent"); <u>Craig v. Rite Aid Corp</u>., 2013 U.S. Dist. LEXIS 2658, at*41 (M.D. Pa. Jan 7, 2013) (recovering $1,845 per participant).

$1,600 after deducting fees and expenses); <u>Craig</u>, 2013 U.S. Dist. LEXIS 2658, at *41 (recovering $1,845 per participant).

Having made these findings, we must ascertain whether the settlement furthers or frustrates the FLSA's implementation in the workplace. <u>Altnor</u>, 197 F. Supp. 3d at 764. On this score, we conclude that "[f]ar from frustrating FLSA, the settlement actually furthers it." <u>Creed</u>, 2013 WL 5276109, at *4. Therefore, the broader policy goals of pay equity in the workplace that the FLSA was enacted to address are fully vindicated through this settlement.

Having addressed these broad concerns and found that the settlement agreement satisfies the core requirements prescribed by the FLSA, we have also considered several more specific aspects of this proposed settlement. At the outset, we have examined the incentive award provisions of the agreement and conclude that the proposed service award allocations are appropriate. Under the terms of the proposed settlement agreement, $37,500 are designated as service payment allocations, with maximums of $10,000 for the three named plaintiffs and $2,500 for three other significant lead plaintiffs.

Incentive payments play an important role in FLSA litigation. These payments recognize the potential hardships that lead plaintiffs may face in FLSA lawsuits and appropriately compensate those plaintiffs for their lead role in vindicating the rights of others. Given the substantial goals that such payments advance:

> Factors to consider when assessing incentive awards are: (a) the risk to the plaintiff in commencing suit, both financially and otherwise; (b) the notoriety and/or personal difficulties encountered by the representative plaintiff; (c) the extent of the plaintiffs personal involvement in the suit in terms of discovery responsibilities and/or testimony at depositions or trial; (d) the duration of the litigation; and (e) the plaintiffs personal benefit (or lack thereof) purely in his capacity as a member of the class. Godshall v. Franklin Mint Co., 2004 WL 2745890, at *6 (E.D.Pa.2004) (citing In re Plastic Tableware Antitrust Litig., 1995 WL 723175, at *2 (E.D.Pa.1995)). This is not a formal test, but merely represents some of "the reasons courts cite for approving such awards." In re U.S. Bioscience Sec. Litig., 155 F.R.D. 116, 121 (E.D.Pa.1994).

Creed, 2013 WL 5276109, at *7. In the instant case, considering the protracted nature of this litigation, the commitment of time and effort that the litigation demanded of lead plaintiffs and the potential reputational risks involved, we find that these incentive awards of $10,000 and $2,500 are fair, reasonable, and consistent with awards previously approved in other, similar cases. Id. (approving $15,000 incentive award); Perry v. FleetBoston Fin. Corp., 229 F.R.D. 105, 118 (E.D. Pa. 2005) (approving $5,000 incentive awards where plaintiffs expended "significant time and resources" for a litigation that had been pending for "over a year").

We also believe that the release language of the settlement agreement is narrowly tailored in a fashion that is appropriate to this case, and thus avoids one of the issues which have concerned courts in the past, release provisions that are "inappropriately comprehensive." Bettger v. Crossmark, Inc., No. 1:13-CV-2030, 2015 WL 279754, at *9 (M.D. Pa. Jan. 22, 2015). The release provision in this settlement agreement is specifically tied to the plaintiffs' FLSA claims and their state

10

law analogues.[2] Since the release is closely tied to the claims set forth in the complaint, it avoids the dangers cited by courts when confronted with global releases and the release provision of the agreement is also approved.

Finally, we have also carefully evaluated the attorneys' fees component of this proposed settlement. As we have noted the proposed settlement creates a total settlement fund of $2,950,000. Of this sum, $1,500,000 is dedicated to collective member compensation. As to the remaining $1,450,000, the agreement calls for the payment of $137,195.83 in litigation expenses incurred by plaintiffs' counsel from the settlement fund. Finally, under the terms of the agreement, plaintiffs' counsel, who have taken the lead over the past four years in pursuing this highly complex and difficult FLSA action, are to receive attorneys' fees of up to $1,312,804.17. This constitutes an attorneys' fee payment of approximately 44% of the total fund. However, according to affidavits submitted in support of this motion seeking

---

[2] This release provision states that: "all FLSA Collective Members shall hereby irrevocably and unconditionally forever and fully release and covenant not to sue or otherwise pursue claims against Defendant and all Released Parties from any and all claims that were asserted or that could have been asserted in this Civil Action related to the payment of regular or overtime wages, including but not limited to all claims, demands, and causes of action for unpaid regular and/or overtime wages, penalties, liquidated damages, interest, costs, attorney's fees, and any other relief under the federal FLSA, 29 U.S.C. § 201, et seq., as well as any similar state or local law governing the payment of regular or overtime wages, arising out of work performed for Defendant as an overtime exempt-classified Operations Manager at any time until and including execution of this Agreement (collectively, the 'Released Claims')." (Doc. 273-3, § 5.1(a)).

approval of the settlement agreement, this negotiated attorneys' fee award is a

significant reduction below the actual fees incurred in the prosecution of this case,

fees which would have otherwise potentially exceeded $2,270,000. (Doc. 273-2, at

9-10; Doc. 273-5, at 6).

In cases of this type, which involve the creation of a common fund for the

benefit of others, courts often rely upon a percentage of recovery analysis when

assessing the reasonableness of a fee award. As this court has observed:

> The percentage of recovery method is generally preferred under the
> common fund doctrine. Keller, 2014 WL 5591033, at *14 (citing In re
> Prudential, 148 F.3d at 333). Under the common fund doctrine, "a
> private plaintiff, or plaintiff's attorney, whose efforts create, discover,
> increase, or preserve a fund to which others also have a claim, is entitled
> to recover from the fund the costs of his litigation, including attorneys'
> fees." Cendant II, 404 F.3d at 187 (quoting In re Gen. Motors, 55 F.3d
> at 820 n. 20). "Further, the percentage of recovery method is the
> prevailing methodology used by courts in the Third Circuit for wage
> and hour cases." Keller, 2014 WL 5591033, at *14; see also
> DiClemente v. Adams Outdoor Adver., Inc., No. 3:15-0596, 2016 WL
> 3654462, *4 (M.D. Pa. July 8, 2016) (same). "[C]ourts have approved
> attorneys' fees in FLSA [collective and class action] settlement
> agreements 'from roughly 20-45%' of the settlement fund." Kraus, 155
> F. Supp. 3d at 534 (quoting Mabry v. Hildebrant, No. 14-5525, 2015
> WL 5025810, at *4 (E.D. Pa. Aug. 24, 2014) (collecting cases)).

Acevedo v. Brightview Landscapes, LLC, No. CV 3:13-2529, 2017 WL 4354809,

at *16 (M.D. Pa. Oct. 2, 2017). When applying the common fund percentage of

recovery method to evaluation of a fees award, we should consider:

> (1) the size of the fund created and the number of persons benefitted;
> (2) the presence or absence of substantial objections by members of the
> class to the settlement terms and/or fees requested by counsel; (3) the

> skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000). We exercise considerable discretion in making these judgments and are cautioned to refrain from employing these factors in any rigid formulaic fashion. Id.

In this case the factors we are urged to consider when evaluating the attorneys' fees component of an FLSA settlement, on balance, favor approval of this attorneys' fee award. At the outset, we note that the proposed attorneys' fee payment of approximately 44% of the total fund falls within the percentage range of fees that have been approved in the past as reasonable—20% to 45%—albeit at the higher end of this range. In our view, however, a fees award at the upper end of the range previously found reasonable is appropriate in this case given the complexity of the ligation, the protracted nature of the lawsuit, the amount of time devoted by counsel to this litigation, and the high level of skill and tenacity displayed by counsel.

We are also persuaded of the reasonableness of this proposed fee award when we consider that this negotiated attorneys' fee award is a significant reduction below the actual fees claimed to be incurred in the prosecution of this case, as reported by counsel in the affidavits filed with this court—fees which would have potentially exceeded $2,270,000. (Doc. 273-2, at 9-10; Doc. 273-5, at 6). In this regard, when evaluating the fees component of an FLSA settlement:

> The Third Circuit has stated that "it is 'sensible' for district courts to 'cross-check' the percentage fee award against the 'lodestar' method." In re Rite Aid Corp., 396 F.3d at 305 (citing In re Prudential, 148 F.3d at 333). The lodestar crosscheck is performed by calculating the "lodestar multiplier," which is determined by dividing the requested fee award by the lodestar. In re AT & T Corp., 455 F.3d 160, 164 (3d Cir.2006). To determine the lodestar method's suggested total, the court multiplies "the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services." In re Rite Aid Corp., 396 F.3d at 305.

Altnor, 197 F. Supp. 3d at 766. In this case, when we perform this lodestar multiplier cross check, the multiplier falls well below a factor of 1, and is only approximately .578.[3] In this regard, it is well settled that " '[a] lodestar multiplier of less than one,' like the lodestar multiplier here, 'reveals that the fee request constitutes only a fraction of the work that the attorneys billed' and thus favors approval." Id. at 767. Therefore, this cross-check analysis further confirms the reasonableness of the fees award negotiated here and favors approval of that award.

---

[3] Our lodestar multiplier math is as follows: Requested fee, $1,132,804. 17, divided by lodestar suggested total, approximately $2,270,000, equals a lodestar multiplier of .578. In conducting this lodestar cross-check, we have not independently assessed the hourly rates claimed by counsel because we deem it unnecessary given how low this multiplier is. In fact, a reduction of the fees by 40% would still yield a lodestar amount of more than $1,360,000—a sum which exceeds the fees requested in this case. In such circumstances, further lodestar analysis is unnecessary. Acevedo v. Brightview Landscapes, LLC, No. CV 3:13-2529, 2017 WL 4354809, at *20 (M.D. Pa. Oct. 2, 2017)

Therefore, finding: (1) that the terms of this settlement that resulted from an arms-length negotiation are fair, reasonable, and adequate as between the parties; and (2) that the purposes of the FLSA are fully satisfied through the proposed resolution of this specific case, the settlement agreement will be approved.

An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KRISTOPHER LAWSON, et al.,** | : | **Civil No. 1:17-CV-1266** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **LOVE'S TRAVEL STOPS &** | : | |
| **COUNTRY STORES, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

## ORDER

AND NOW this 23d day of February 2021, this matter came before the Court upon Plaintiffs' Unopposed Motion for Approval of Settlement of Collective Action and to Dismiss Action with Prejudice. Having reviewed the Motion and all accompanying papers, and the Court being otherwise fully advised, it is ORDERED AND ADJUDGED as follows: The Plaintiffs' Motion (Doc. 273) is GRANTED. The Court finds that the Parties' Settlement in this Fair Labor Standards Act lawsuit is fair, reasonable, and just. Accordingly:

1. The Parties' Settlement and all of its terms is APPROVED. The Claims Administrator is authorized to send the notices and issue payments pursuant to the terms of the Settlement.

16

2. This Action is DISMISSED WITH PREJUDICE.

3. At the request of the parties and consistent with the terms of the settlement agreement, this Court will RETAIN JURISDICTION to enforce the Settlement until the conclusion of the settlement administration process.

4. The clerk is DIRECTED to otherwise CLOSE this case.

_/s/ Martin C. Carlson_
Martin C. Carlson
United States Magistrate Judge